**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 14 2002**

**PATRICK FISHER**
**Clerk**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROBERT WESLEY KNIGHTON,

      Petitioner-Appellant,

v.

MIKE MULLIN, [*] Warden, Oklahoma
State Penitentiary,

      Respondent-Appellee.

No. 00-6442

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-98-459-T)**

---

John M. Stuart of Stuart, Frieda & Hammond, P.C., Duncan, Oklahoma (Don J.
Gutteridge, Jr., Oklahoma City, Oklahoma, with him on the briefs), for Petitioner-
Appellant.

Robert L. Whittaker, Assistant Attorney General, Criminal Division (W.A. Drew
Edmondson, Attorney General of Oklahoma, with him on the brief), Oklahoma
City, Oklahoma, for Respondent-Appellee.

---

Before **SEYMOUR** , Circuit Judge, **BRORBY** , Senior Circuit Judge, and
**BRISCOE** , Circuit Judge.

---

[*]     Mike Mullin replaced Gary Gibson as Warden of the Oklahoma State
Penitentiary effective March 25, 2002.

**BRORBY** , Senior Circuit Judge.

Robert Wesley Knighton appeals the denial of habeas relief, *see* 28 U.S.C. § 2254, from two Oklahoma first degree murder convictions and death sentences. A jury convicted Knighton of shooting to death Richard and Virginia Denney during Knighton's multi-state crime spree. Knighton claims 1) the trial court's admitting evidence of the many other crimes Knighton committed during his four-day crime spree resulted in a fundamentally unfair trial; 2) prosecutors' belated disclosure of *Brady v. Maryland* , 373 U.S. 83 (1963), material prejudiced his defense; and 3) trial counsel's representation at sentencing was constitutionally ineffective. We affirm.

## I. FACTS

In January 1990, Knighton left a Kansas City, Missouri halfway house and embarked on a four-day crime spree. Accompanying the forty-eight year old Knighton was his twenty year old girlfriend, Rene Williams, and his seventeen year old friend, Lawrence Brittain. Two days after leaving Kansas City and needing money and a new vehicle, Knighton and Brittain approached the Denneys' isolated rural Oklahoma home. Knighton then shot the couple to death

and took the couple's truck. Texas police arrested the trio the next day, still driving the Denneys' truck.

Before Knighton's trial, Brittain pled guilty to two counts of first degree murder and received two concurrent life sentences. And Williams pled guilty to being an accessory after the fact, receiving concurrent fifteen year prison sentences. Both then testified against Knighton at his trial. The jury convicted Knighton of two counts of first degree murder, based on alternate theories of malice aforethought and felony murder.

During the capital sentencing proceeding, the jury found three aggravating factors: Knighton had suffered prior violent felony convictions, had created a great risk of death to more than one person, and was a continuing threat to society. The jury declined to find that Knighton had killed the Denneys to avoid his arrest or prosecution for robbing them. After considering Knighton's mitigating evidence, the jury imposed two death sentences. The Oklahoma Court of Criminal Appeals affirmed Knighton's convictions and death sentences, *see Knighton v. State*, 912 P.2d 878 (Okla. Crim. App.), *cert. denied*, 519 U.S. 841 (1996), and denied post-conviction relief in an unpublished decision.

## II. STANDARDS OR REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Knighton will be entitled to habeas relief only if he can establish that the state courts' resolution of his claims "was contrary to, or involved an unreasonable application of, clearly established" Supreme Court precedent, or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We presume correct any state-court factual finding, absent clear and convincing proof to the contrary. *See id.*, § 2254(e)(1). If, instead, the state courts did not address Knighton's habeas claim's merit, we will review the district court's legal determinations *de novo*, and any factual finding for clear error. *See, e.g., Romano v. Gibson*, 278 F.3d 1145, 1150 (10th Cir. 2002).

## III. ISSUES

**A.   *Admitting evidence of other crimes.*** Knighton challenges the trial court's admitting evidence of the other crimes and bad acts he committed during this four-day crime spree. In fact, the trial court, during the trial's first stage, admitted evidence that, when Knighton and Williams discovered that Brittain was going to be sent to prison, they convinced him to flee instead; Knighton told Williams and Brittain, before they fled, that there might be murders and robberies

-4-

along the way; Knighton stole a van; Knighton shot and killed two men in Clinton, Missouri; the group then stole money, weapons and a radio from the two murdered Missouri men; while traveling across Oklahoma, the trio tried unsuccessfully to steal a car from a parking lot, and to abduct and kill a motorist and steal her car; planned to rob a convenience store and kill the clerk; broke into a vacant rural home, stealing a pair of boots and an empty wallet; sought another residence, in addition to the Denneys' home, to "take over"--that is, to kill the occupants and take what they wanted; Knighton's reaching for his gun in an effort to kill a mechanic who had unnecessarily replaced a fuel pump on the Denneys' truck; looking, in Texas, for still another home to "take over;" and again reaching for his gun when a deputy sheriff stopped them.

In denying relief on direct appeal, the Oklahoma Court of Criminal Appeals applied only state evidentiary rules. *See Knighton*, 912 P.2d at 888-90 (applying Okla. Stat. Ann. tit. 12, §§ 2403, 2404). The question presented in these habeas proceedings, however, is not whether this evidence was admissible under state law, but instead whether, considered in light of the entire record, its admission resulted in a fundamentally unfair trial. *See, e.g., Estelle v. McGuire*, 502 U.S. 62, 67-68, 70 (1991); *Smallwood v. Gibson*, 191 F.3d 1257, 1277 (10th Cir. 1999). "[W]e will not disturb a state court's admission of evidence of prior crimes, wrongs or acts unless the probative value of such evidence is so greatly

outweighed by the prejudice flowing from its admission that the admission denies defendant due process of law." *Duvall v. Reynolds*, 139 F.3d 768, 787 (10th Cir. 1998) (further quotation omitted) (pre-AEDPA). Although Knighton did raise this constitutional due process argument on direct appeal, the Oklahoma appellate court did not specifically address it. We, therefore, review this habeas claim *de novo. See Romano*, 278 F.3d at 1150.

The trial court admitted this other-crimes evidence, holding it was "extremely probative of [Knighton's] motive, intent, plans, schemes, and course of events . . . leading" to the Denneys' murders. Tr. Oct. 15, 1990 hr'g at 2-3. *See generally Hale v. Gibson*, 227 F.3d 1298, 1321 (10th Cir. 2000) (noting Oklahoma Court of Criminal Appeals "has repeatedly allowed the admission of evidence of other crimes to prove motive, common scheme, identity, plan, knowledge, or absence of mistake or accident"), *cert. denied*, 533 U.S. 957 (2001). Admitting this evidence of Knighton's other crimes and bad acts did not result in a fundamentally unfair trial. Rather, this evidence was relevant to explain the facts surrounding the Denneys' murders. *See McGuire*, 502 U.S. at 68-69 (reviewing evidence's relevancy in determining whether trial court's admitting evidence of prior injuries resulted in fundamentally unfair trial); *cf. Chase v. Crisp*, 523 F.2d 595, 600 n.4 (10th Cir. 1975) (noting "[w]here all of the acts are connected to the chain of events" that includes the crime charged, "all are

admissible even though the full story tends to show the commission of other offenses").

Furthermore, this evidence also tended to establish Knighton's intent and motive. Because the State had charged Knighton alternately with malice aforethought and felony murder, the State had to establish either that Knighton had deliberately intended unlawfully to kill the Denneys, or at least that he intended to rob them at gunpoint. *See* Okla. Stat. Ann. tit. 21, § 701.7(A, B). Evidence of the other crimes he committed during this crime spree tended to establish that Knighton possessed both these intentions when he approached the Denneys' home.

Lastly, this evidence of Knighton's other crimes helped establish Knighton's role as the group's leader and triggerman. This was particularly relevant in light of the defense's argument that it was actually Brittain who killed the Denneys and then, with Williams, concocted a plot to blame the murders on Knighton. *Cf. Hopkinson v. Shillinger*, 866 F.2d 1185, 1198 (10th Cir. 1989) (determining introducing evidence of other crimes did not warrant habeas relief where such evidence was relevant to relationship between petitioner and acquaintance to whom petitioner might have turned to help him murder victim).

Moreover, the trial court limited jurors' consideration of this other-crimes evidence, instructing them that

EVIDENCE HAS BEEN RECEIVED THAT THE DEFENDANT HAS ALLEGEDLY COMMITTED OFFENSES OTHER THAN THAT CHARGED IN THE INFORMATION. YOU MAY NOT CONSIDER THIS EVIDENCE AS IN ANY WAY TENDING TO PROVE THE GUILT OR INNOCENCE OF THE DEFENDANT(S) OF THE SPECIFIC OFFENSE CHARGED IN THE INFORMATION. THIS EVIDENCE HAS BEEN RECEIVED SOLELY ON THE ISSUE OF THE DEFENDANT['S] ALLEGED MOTIVE AND/OR OPPORTUNITY, INTENT AND/OR PREPARATION AND/OR PLAN AND/OR KNOWLEDGE. THIS EVIDENCE IS TO BE CONSIDERED BY YOU ONLY FOR THE LIMITED PURPOSE FOR WHICH IT WAS RECEIVED.

O.R. at 294 (first-stage instruction 14). The court also gave this instruction at the beginning of the trial and referred to it throughout the proceedings. *See Smallwood*, 191 F.3d at 1277 (noting proper jury instruction can cure error in admitting evidence of defendant's prior crimes or bad acts); *see also Hopkinson*, 866 F.2d at 1199.

Knighton further argues that admitting this other-crimes evidence also resulted in a fundamentally unfair capital sentencing proceeding. The Constitution, however, does not preclude a capital sentencer from considering unadjudicated bad acts. *See, e.g., Smith v. Gibson*, 197 F.3d 454, 460 (10th Cir. 1999); *Smallwood*, 191 F.3d at 1276.

**B. Brady *claims.* *Brady v. Maryland*, 373 U.S. 83, 87 (1963), provides that the State's suppression of "evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment." *See also Kyles v. Whitley*, 514 U.S. 419, 432-33 (1995). This is so irrespective of the

prosecution's good or bad faith. *See Brady*, 373 U.S. at 87. Thus, to establish a *Brady* violation, a habeas petitioner must show that "(1) the prosecutor suppressed evidence; (2) the evidence was favorable to the defendant as exculpatory or impeachment evidence; and (3) the evidence was material." *Gonzales v. McKune*, 247 F.3d 1066, 1075 (10th Cir. 2001), *vacated in part on other grounds*, 279 F.3d 922, 924 (10th Cir. 2002) (en banc), *petition for cert. filed*, (U.S. May 7, 2002) (No. 01-10243). Generally, evidence is material if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *See Kyles*, 514 U.S. at 434.

Here, however, defense counsel discovered the prosecution's failure to disclose *Brady* material at the beginning of trial, while cross-examining only the State's third witness. The trial judge then went through the State's files and turned over to the defense a significant amount of additional *Brady* material. The trial court also continued trial from October 23 until November 1, to give the defense an opportunity to review this new material. On November 1, the defense announced it was ready to continue with the trial. *See* Trial tr. vol. 1 at 1-3. [1]

---

[1] The defense did, later that day, unsuccessfully renew its request for an additional continuance. *See id.* at 1-34.

The materiality question presented here, then, is instead whether there is a reasonable probability that the outcome of either trial stage would have been different had the State disclosed this information earlier. *See United States v. Young*, 45 F.3d 1405, 1408 (10th Cir. 1995)[2] (direct criminal appeal); *see also Gonzalez-Montoya*, 161 F.3d at 649-50 (considering whether government's late disclosure of impeachment evidence affected trial's result); *Scarborough*, 128 F.3d at 1376 (holding no *Brady* violation where government makes *Brady* material available during trial, "[a]s long as ultimate disclosure is made before it is too late for the defendant[] to make use of any benefits of the evidence.") (further quotation omitted). We make this determination in light of the record as a whole. *See, e.g, Rojem v. Gibson*, 245 F.3d 1130, 1139, 1140 (10th Cir. 2001). We ultimately measure the materiality of the belatedly disclosed information collectively. *See Kyles*, 514 U.S. at 421, 436-37 & 436 n.10.

Knighton asserts that the State's delay in disclosing *Brady* material in this case prejudiced his efforts to suppress his custodial statements, his opportunity to

---

[2] In *Young*, this court assumed, without deciding, that the government's disclosure of favorable evidence to the defense at trial could violate *Brady*. *See* 45 F.3d at 1408 n.2. Neither party here argues to the contrary. Furthermore, this court has, since *Young*, analyzed claims challenging the government's delayed disclosure of evidence favorable to the accused under *Brady*. *See, e.g., United States v. Gonzales-Montoya*, 161 F.3d 643, 649-50 (10th Cir. 1998) (direct criminal appeal); *United States v. Woodlee*, 136 F.3d 1399, 1411 (10th Cir. 1998) (direct criminal appeal); *United States v. Scarborough*, 128 F.3d 1373, 1376 (10th Cir. 1997) (direct criminal appeal).

develop an insanity defense, and his defense generally during both the trial's guilt and capital sentencing stages. The Oklahoma Court of Criminal Appeals, however, denied relief, holding instead that the "trial court [had] acted swiftly and appropriately to cure this egregious error," and that the undisclosed evidence was ultimately not material. *Knighton*, 912 P.2d at 891, 892-94. For the following reasons, that determination was neither contrary to, nor an unreasonable application of, *Brady*. *See* 28 U.S.C. § 2254(d)(1); *see also, e.g., Moore v. Gibson*, 195 F.3d 1152, 1165 (10th Cir. 1999) (reviewing, under § 2254(d)(1), state court's decision resolving *Brady* claim).

### 1. *Motion to suppress.*

**a. *Initial stop and arrest.*** A Texas deputy sheriff, Douglas Tennent, stopped Knighton, Brittain and Williams the day following the Denneys' murders, after a citizen in Canadien, Texas, reported seeing them driving several times very slowly around the same residential block, looking through the houses. Shortly thereafter, Sheriff Billy Bowen arrived on the scene and arrested Knighton, Brittain and Williams, after discovering two firearms in the Denneys' truck, in violation of Texas law.

Prior to trial, Knighton unsuccessfully challenged the validity of this stop and his subsequent arrest. Nonetheless, after receiving the belatedly produced *Brady* materials, *see* Defendant's ex. 7A, 65A, 66A, defense counsel had the

-11-

opportunity to review that information and was able to cross-examine Deputy Tennent and Sheriff Bowen at trial about this stop and arrest. In fact, defense counsel used these reports to cross-examine these witnesses. Knighton then renewed his suppression motion. The trial court took that motion under advisement, and ultimately denied it at the close of the first-stage evidence. Knighton fails to establish here that, had the State disclosed this *Brady* information earlier, there was a reasonable probability that Knighton could have prevailed on his suppression motion. *See Gonzalez-Montoya*, 161 F.3d at 649-50 (holding government's late disclosure did not affect trial's outcome, where defense counsel had opportunity to review belatedly produced information and cross-examine witness about it at trial); *see also Woodlee*, 136 F.3d at 1411.

**b.** ***State's presentation of perjured testimony.*** Knighton also asserts that these same belatedly produced documents, Defendant's ex. 7A, 65A and 66A, further establish that Deputy Tennent and Sheriff Bowen lied during their preliminary hearing testimony. The prosecutor's knowing use of perjured testimony, or the knowing failure to disclose that testimony used to obtain a conviction was false, requires the reversal of a conviction if there is any reasonable likelihood that the false testimony could have affected the jury's decision. *See, e.g., Giglio v. United States*, 405 U.S. 150, 153-54 (1972).

Knighton, however, fails to establish that such a claim warrants habeas relief in this case.

The only discrepancy between Deputy Tennent's testimony and his earlier interview, *see* Defendant's ex. 65A, involved the front license plate on the Denneys' truck. At the preliminary hearing and at trial Tennent testified that, although the police dispatcher had notified him to look for a truck with Oklahoma license plates, when he first saw the truck Knighton was driving, the deputy saw an unidentified front license plate that was not from Texas. In his January 1990 interview, however, Deputy Tennent asserted, instead, that the truck "had no front license plate, state wise." Defense Ex. 65A at 1. That hardly contradicts his trial testimony. *See United States v. Wolny*, 133 F.3d 758, 763 (10th Cir. 1998) (direct criminal appeal). In any event, "'[c]ontradictions and changes in a witness's testimony alone do not constitute perjury and do not create an inference, let alone prove, that the prosecutor knowingly presented perjured testimony.'" *Id.* (quoting *Tapia v. Tansy*, 926 F.2d 1554, 1563 (10th Cir. 1991)). Moreover, defense counsel had a copy of Deputy Tennent's interview at trial and was able to explore, during cross-examination, any inconsistencies between that interview and Tennent's trial testimony. *See United States v. Vaziri*, 164 F.3d 556, 564 (10th Cir. 1999); *Tapia*, 926 F.2d at 1563.

In any event, this discrepancy is not material under either *Giglio* or *Brady*. Deputy Tennent consistently asserted that he stopped Knighton because of the reports of this vehicle's suspicious activity, and not for any traffic violation involving the truck's front license plate.

Nor is there any discrepancy warranting habeas relief between Sheriff Bowen's testimony and his reports to Oklahoma law enforcement officials, *see* Defendant's ex. 7A, 66A. Sheriff Bowen's assertion that he detained Knighton, Brittain and Williams until their stories could be checked out, *see* Defendant's ex. 7A at 4, does not directly contradict his trial testimony that he arrested these three suspects for Texas firearms violations. *See Wolny*, 133 F.3d at 763. Further, in light of Sheriff Bowen's finding the first firearm in the truck, in violation of Texas law, any discrepancy between Sheriff Bowen's testimony and his reports concerning the circumstances surrounding his finding a second such weapon, *see* Defendant's ex. 66A at 2, are not material to the validity of Knighton's arrest.

> **2. *Guilt-stage defense.*** Knighton's defense at trial was that it was actually Brittain, and not Knighton, who shot the Denneys. In support of this theory, defense counsel had planned to bring out at trial Brittain's fledgling connection with the Aryan Brotherhood, and his possible desire to gain status with that group, to explain why Brittain might have killed the Denneys. Knighton

now argues his attorney had to abandon that aspect of his defense after the State belatedly turned over a document indicating Knighton had made a post-arrest statement acknowledging his own active membership in that group. *See* Defendant's ex. 2A at 1-2.

That alone, however, is not sufficient to warrant habeas relief. *See Scarborough*, 128 F.3d at 1375-76 (holding there was no *Brady* violation where government disclosed evidence during trial, at time when it was not too late for defense to make use of that evidence, notwithstanding that earlier disclosure might have changed defense strategy). The State's delayed disclosure did not deprive Knighton of a defense he otherwise would have had. *Cf. Gonzalez-Montoya*, 161 F.3d at 650 (denying *Brady* claim, noting that, even if defense counsel had had additional time to prepare, counsel's concern that introducing belatedly produced evidence would implicate defendant would not have abated). Nor had defense counsel, prior to the State's disclosure of this information, argued to the jury during her opening argument concerning either Brittain's or Knighton's Aryan Brotherhood membership.

More importantly, as Knighton acknowledges, his membership in the Aryan Brotherhood did not come as a surprise to defense counsel. Rather, the pretrial record is replete with references to Knighton's membership in that organization. At the case's outset, Knighton's membership in at least one white supremacist

group was the basis for additional security during his initial appearance. And, during the preliminary hearing, Jailer Duroy, Investigator Ham and Undersheriff Busby all testified to Knighton's extensive comments to them about the Aryan Brotherhood, as well as Knighton's corresponding hatred for African-Americans. "There can be no suppression by the state of evidence already known by and available to [the defendant] prior to trial." *McGregor v. Gibson*, 219 F.3d 1245, 1253-54 (10th Cir. 2000) (further quotation omitted), *overruled on other grounds,* 248 F.3d 946 (10th Cir. 2001) (en banc); *see also, e.g., United States v. Quintanilla*, 193 F.3d 1139, 1149 (10th Cir. 1999).

In addition to this information concerning the Aryan Brotherhood, Knighton also argues that he could have used the following belatedly disclosed documents to bolster his defense theory that it was really Brittain who shot the Denneys: at the preliminary hearing, a jailer overheard Knighton tell Brittain to say that Knighton had committed the murders, *see* Defendant's ex. 3A; a report indicated Knighton had five .22 caliber bullets on him when he was arrested, *see* Defendant's ex. 29A at 3, instead of .38 caliber ammunition used to kill the Denneys; and Brittain's written statement indicated it was Williams, and not Knighton, who first suggested stopping at the Denneys' home, *see* Defendant's ex. 33A at 10. Knighton, however, had this information shortly after the trial began and was able to present this evidence in his defense. Knighton fails to

establish how the State's earlier disclosure of these documents would have better enabled him to present his defense such that there was a reasonable probability the jury would have acquitted him.

Lastly, Knighton asserts that the State's belated disclosure of Knighton's own statements to law enforcement officials prejudiced his trial defense. He fails, however, to identify specifically the statements to which he refers and the particular harm their belated disclosure caused his defense. *See United States v. Green*, 178 F.3d 1099, 1109 (10th Cir. 1999) (denying *Brady* claim where, among other things, defendant failed to identify any particular exculpatory evidence government failed to disclose).

> **3.   *Insanity defense/second-stage mitigating evidence.***   Knighton contends that there were "many, many references to Mr. Knighton being crazy," Trial tr. vol. VIII at 1475, in the belatedly produced documents that might have supported an insanity defense, or at least prompted defense counsel to investigate pursuing such a defense, and that otherwise could have been used as mitigation evidence during the capital sentencing proceeding. Knighton, however, had this information, in some form, prior to trial and was able to present it in his defense.

Knighton specifically points to the State's delay in disclosing a transcript of a statement he made to Texas officials after his arrest which, according to Knighton, would have supported his claim that his untreated high blood pressure

influenced his actions during this crime spree. *See* Defendant's ex. 1A at 5. Knighton, however, never further explains how this information may have affected his culpability for these murders, nor how it might otherwise have been a mitigating factor. Moreover, defense counsel had other information, prior to trial, indicating that Knighton suffered from high blood pressure and took medication for that condition, but that he did not have that medication during this crime spree. Again, "[t]here can be no suppression by the state of evidence already known by and available to [the defendant] prior to trial." *McGregor*, 219 F.3d at 1253-54 (further quotation omitted); *see also, e.g., Quintanilla*, 193 F.3d at 1149.

Additionally, Brittain did testify at trial that Knighton had searched through the Missouri victim's home looking for medication to "relieve" his "blood pressure condition." Trial tr. vol. 4 at 4-53, 4-105. This information, therefore, was before the jury. Knighton fails to assert how the State's earlier disclosure of Defendant's ex. 1A would have enabled him to make better use of this information such that there is a reasonable probability that the result of either trial stage would have been different.

Knighton also challenges the State's delayed disclosure of Defendant's ex. 2A, in which Undersheriff Busby noted that Knighton had told him:

> this shouldn't of happened. I tried to get them to send me back to the joint, but they wouldn't. I think I have a real mental problem. I controlled it for a long time cause I was taking valium. I told em not to take me off the valium but they wouldn't listen. I was taking

about eight a day when I was in the joint, but they cut me off when I went to the halfway house on parole. They started weaning me off of it. I told em to sen[d] me back to the joint but they wouldn't do it[] so I tried to get my parole revoked. I went out and got drunk three times, but they wouldn't revoke me. Sometimes I can't control myself and I know it. They did too, but wouldn't keep me on the valium. I wouldn't be where I'm at today and none of this would have happened if they would have listened to me. He stated he was sorry those people had died and he knew that he would have to die because of it. Said he felt real bad about the old people and then he said oh well, let's drop it.

Defendant's ex. 2A at 2. This information, however, was the focus of Knighton's second-stage defense and he presented this information in great detail at sentencing. The defense clearly possessed this information prior to trial. And, in fact, the State provided this same information during the preliminary hearing. *See United States v. Hernandez-Muniz*, 170 F.3d 1007, 1011 (10th Cir. 1999); *see also, e.g., United States v. McElhiney*, 275 F.3d 928, 933 (10th Cir. 2001); *McGregor*, 219 F.3d at1253-54; *Quintanilla*, 193 F.3d at 1149. In light of this, we cannot conclude that, if the State had disclosed this particular document earlier, there is a reasonable probability the result of either trial stage would have been different.

In addition, Defendant's ex. 4A, a summary of Undersheriff Busby's testimony, indicated he overheard Knighton's conversation with Williams in which Knighton suggested that, since he was "going to die for this" anyway, he should just kill himself. One of Knighton's psychiatric experts, however, did

-19-

testify at trial concerning Knighton's several previous suicide attempts. And Williams herself had previously testified, at the preliminary hearing, about Knighton's two apparent suicide attempts occurring during the four-day crime spree. There was also similar testimony at trial. Defendant's ex. 4A, therefore, was merely cumulative to the other evidence that the defense possessed prior to trial indicating that Knighton was suicidal. Thus, this belatedly disclosed document would have added only marginal, additional support to Knighton's defense. It was, therefore, not material. *See United States v. Trujillo*, 136 F.3d 1388, 1394 (10th Cir. 1998).

Lastly, Knighton challenges the State's delay in disclosing Williams' transcribed verbal statement to Texas authorities, *see* Defendant's ex. 9A, as well as her written statement, *see* Defendant's ex. 42A, and a Texas Ranger's report summarizing Williams' statements, *see* Defendant's ex. 31A. These documents included Williams' description of Knighton's hysterical reaction to the murders. Knighton, however, was aware of this same information prior to trial, following the preliminary hearing. *See Hernandez-Muniz*, 170 F.3d at 1011. Further, Williams testified to this at trial. *See, e.g., McElhiney*, 275 F.3d at 933; *McGregor*, 219 F.3d at 1253-54; *Quintanilla*, 193 F.3d at 1149. The State's belated disclosure of these documents, therefore, did not preclude Knighton from

timely using this information to investigate a possible insanity defense or as mitigating evidence.

**4.     *Cumulative effect.*** Because Knighton had most all of this belatedly disclosed information in some form prior to trial and defense counsel was, in any event, able to use this belatedly produced *Brady* material during trial, we cannot conclude that, had the State disclosed these additional documents earlier, there is a reasonable probability either trial stage would have resulted in a different outcome. Considering the cumulative effect of the State's belated disclosure of this information, then, we conclude the Oklahoma appellate court's decision denying relief was not contrary to, nor an unreasonable application of, *Brady*. *See* 28 U.S.C. § 2254(d).

**C.     *Ineffective representation at sentencing.*** Lastly, Knighton asserts that his trial attorney should have obtained neuropsychological tests on Knighton and presented those test results during the capital sentencing proceeding. [3] Although the Oklahoma Court of Criminal Appeals held Knighton had

---

[3]     Knighton, in passing in his brief to this court, also suggests his direct-appeal counsel was ineffective for failing to raise this claim on appeal, *see* Appellant's Opening Br. at 44; Appellant's Reply Br. at 21, and that trial counsel was ineffective for failing to obtain and present other additional mitigating evidence, *see* Appellant's Opening Br. at 41. We need not address these claims, however, in light of the conclusory manner in which Knighton asserts them. *See, e.g., Romano*, 278 F.3d at 1155. And, in any event, our review of the record convinces us that these claims would not otherwise warrant habeas relief.

procedurally defaulted this claim, the State does not reassert that affirmative defense to this court. *See, e.g., Hooks v. Ward*, 184 F.3d 1206, 1216 (10th Cir. 1999). We, therefore, address this claim's merit *de novo*. *See, e.g., James v. Gibson*, 211 F.3d 543, 557 (10th Cir. 2000); *see also Romano*, 278 F.3d at 1150.

To obtain habeas relief, Knighton must establish both that trial counsel's performance was constitutionally deficient and that his defense was thereby prejudiced. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Here, we need only address *Strickland*'s prejudice inquiry. *See id.* at 697. To establish the requisite prejudice during a capital sentencing proceeding, Knighton must show that "there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.* at 695. In making this determination, we consider the strength of the State's case and the number of aggravating factors the jury found to exist, as well as the mitigating evidence the defense did offer and any additional mitigating evidence it could have offered. *See, e.g., Neill v. Gibson*, 278 F.3d 1044, 1062 (10th Cir. 2001), *petition for cert. filed*, (U.S. May 6, 2002) (No. 01-10121).

Here, the State's case against Knighton, in both trial stages, was strong. During the capital sentencing stage, the jury found the existence of three aggravating factors: Knighton had suffered prior violent felony convictions, he

had created a great risk of death to more than one person, and he was a continuing threat to society. And the record well supported these factors. In addition to incorporating the first stage evidence, the State offered proof that Knighton had previously suffered violent felony convictions for manslaughter, first degree robbery, armed robbery and kidnapping. Several of those convictions resulted from an earlier crime spree during which Knighton, armed with a handgun, took drugs and money from a pharmacy. The next day, Knighton shot and killed a "well known" criminal, Trial tr. vol. 6 at 6-33, after that victim purportedly threatened Knighton with a weapon. During this same altercation, Knighton also wounded the victim's father. Knighton then broke into a nearby home and waited there until the residents, a couple and their six year old daughter, returned home. Knighton then took them hostage. He drugged the father with medication stolen from the pharmacy and then took these three hostages to a rural area, where he locked them in a shed. Later, Knighton, heavily armed, drove the hostages across Missouri. Eventually, the hostages escaped, after the kidnapped woman attacked Knighton in a restaurant with a steak knife. In addition to these crimes, the State also presented evidence that, while in jail, Knighton had threatened to kill one of his cellmates.

In mitigation, the defense then presented the testimony of Knighton's drug rehabilitation counselor and two mental health experts, Dr. William Logan, M.D.,

a psychiatrist, and Dr. R. Lee Evans, a psychopharmacologist. Both Drs. Logan and Evans interviewed Knighton for several hours prior to trial, in addition to reviewing numerous documents, prison records and medical reports. These witnesses testified to Knighton's abusive, tumultuous and deprived childhood; his academic struggles; the failure of his marriage following the death of his son; and his being incarcerated for all but two of the thirty years preceding the Denneys' murders. These defense witnesses also offered a great deal of psychiatric evidence, including testifying to Knighton's depression and substance abuse; his several suicide attempts and suicidal ideation; his lengthy treatment with psychiatric medications during his incarceration; his mental commitments while in prison; and his documented difficulties with memory loss, periods of amnesia, fairly severe chronic depression, and perhaps some organic brain damage.

These witnesses also testified to Knighton's significant anxiety at being released from prison, prior to the Denneys' murders. Dr. Logan noted that Knighton "clearly had to have some very clear, set routine, and this is occasionally the case for those who are very anxious or who even may have some cognitive difficulties, doing a set pattern of activities, doing a certain thing at a certain time every day." *Id.* at 6-142. In fact, on a number of prior occasions, prison officials had transferred Knighton to prisons with less security, only to have him request to return to the maximum security prison, with its more

-24-

regimented lifestyle.  In 1989, just a few months before the Denneys' murders, Knighton had become extremely anxious because his prison sentence was nearing its end.  When prison officials released Knighton to a halfway house, he became fearful he would be killed or he would harm someone else.  Part of his high anxiety stemmed from suppressing those thoughts.  Further, he feared he would be unable to control his impulses.  In fact, Dr. Lee testified that he believed Knighton "has had almost lifelong thoughts about hurting people, which he has expended a fair amount of energy suppressing."  *Id.* at 6-92.  Upon releasing him to a halfway house, prison officials tried to wean Knighton quickly from the heavy doses of psychiatric medications with which they had been treating him while he had been incarcerated.  Those medications actually weakened Knighton's ability to control his violent impulses, once that medication was withdrawn.

Dr. Lee believed that Knighton's anxiety could still be controlled through medication and that "the recurring impulsive thoughts that he has could        possibly be controlled."  *Id.* at 6-95.  Dr. Lee also indicated that Knighton seemed "incredibly remorseful for his crimes."  *Id.* at 6-93.

Defense counsel, then, did present a great deal of psychiatric evidence at sentencing, although the defense did not do so under the rubric of organic brain damage.  *See generally Humphreys v. Gibson*, 261 F.3d 1016, 1020-21 (10th Cir. 2001) (rejecting claim that defense counsel should have presented additional

-25-

psychiatric evidence, where defense counsel did put forth psychiatric evidence at sentencing and there was no reasonable probability that, had counsel put on evidence of additional diagnoses, jury would have declined to impose death sentence). Knighton now submits the report of Dr. Philip Murphy, Ph.D., who, post-trial, administered a number of psychological tests to Knighton. Dr. Murphy concluded Knighton had "significant organic brain damage present, with a likely psychotic condition with auditory and visual hallucinations which were mood-congruent with a deeply depressed man." Post-conviction application app. N at 4. The report otherwise reiterates psychiatric information similar to that already presented to the jury during sentencing. *See Humphreys*, 261 F.3d at 1021, and cases cited therein (holding evidence which is essentially cumulative to that already presented to jury will not be sufficient to establish reasonable probability jury would have reached different result).

And, while evidence that Knighton suffered from organic brain damage would have been legitimate mitigating evidence, *see Bryan v. Gibson*, 276 F.3d 1163, 1178 (10th Cir. 2001), *reh'g en banc granted*, this court has, "on numerous occasions determined that . . . evidence of low I.Q. and/or organic brain damage does not outweigh evidence supporting . . . multiple aggravating circumstances," *Smith*, 197 F.3d at 463 (further quotation omitted). That is also true here. We cannot conclude, therefore, that Knighton's second-stage defense was prejudiced

by the lack of any neurological testing. There is not a reasonable probability that, had defense counsel presented Dr. Murphy's post-trial finding that Knighton has organic brain damage, the jury would have imposed a sentence less than death. *See, e.g., Neill*, 278 F.3d at 1063; *McCracken v. Gibson*, 268 F.3d 970, 979-80 (10th Cir. 2001), *petition for cert. filed*, (U.S. May 17, 2002) (No. 01-10302); *Humphreys*, 261 F.3d at 1021, and cases cited therein.

## IV.  CONCLUSION

For these reasons, we AFFIRM the district court's decision denying Knighton habeas relief.