F I L E D
**United States Court of Appeals**
**Tenth Circuit**

**OCT 17 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

WALLY MARTINEZ,

Defendant - Appellant.

No. 02-4200

(D. Utah)

(D.C. No. 01-CR-564-01-B)

**ORDER AND JUDGMENT** *

Before **EBEL**, **ANDERSON**, and **HARTZ**, Circuit Judges.

Wally A. Martinez was charged by indictment with one count of bank robbery in violation of 18 U.S.C. § 2113(a); one count of felon in possession of a firearm in violation of 18 U.S.C. § 922(g); two counts of interference with commerce by threats or violence in violation of 18 U.S.C. § 1951(a); and three counts of possession of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c). A jury found Martinez guilty of all charges, and he was

---

*This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

sentenced to sixty-five years in prison. On appeal, Martinez argues that the district court erred: (1) by refusing to grant a mistrial, either under <u>Brady v. Maryland</u>, 373 U.S. 83 (1963), or as a discovery sanction, due to the prosecutor's failure to disclose before trial evidence obtained from a confidential informant; and (2) by refusing to sever the charges, which arose in connection with three separate robberies. For the reasons set forth below, we affirm.

## BACKGROUND

On September 21, 2001, two individuals—a man and a woman—robbed Beehive Credit Union in Taylorsville, Utah, obtaining $2,552. When, later that day, FBI agents reviewed the surveillance photographs taken during the robbery, one agent identified the female perpetrator as Jamie A. Lucero. The FBI had previously been told by the West Jordan Police Department, based on information obtained from Greg Magalogo, a confidential informant, that Lucero was planning a series of robberies with an unknown accomplice named "Steve." The FBI had identified the unknown "Steve" as Lucero's acquaintance, Steven Evans, but concluded, after some investigation, that Evans had abandoned the planned robberies after police stopped him for unrelated reasons. After identifying Lucero as one of the credit union robbers, the FBI asked the West Jordan police whether Magalogo had any new information. The police reported that Magalogo

confirmed Lucero's participation in the credit union robbery and identified Lucero's accomplice as "Demon." FBI agents then arrested Lucero at her residence and asked her where "Demon" was. It is undisputed that Mr. Martinez's gang moniker is "Demon." Lucero confessed to the robbery and identified Mr. Martinez as her accomplice. The FBI found Martinez that evening at the motel where Lucero told them he would be and placed him under arrest.

Lucero's statement to the FBI and her testimony at trial presented the following story: Lucero and Martinez had planned the credit union robbery the night before. Martinez kept Lucero's car, a white Pontiac Grand Am, overnight. The next morning, Martinez picked Lucero up in her car, and they drove to the vicinity of the credit union. Before entering the credit union, Lucero and Martinez went first to a Rite Aid and then to a Reams food store, where they stole sunglasses for Lucero and a black bandanna for Martinez to wear around his neck to hide his tattoos. In the Reams parking lot, they removed the car's rear license plate. Martinez wrote a demand note on a notepad in upper case block letters. He put a .22 handgun belonging to Lucero in his waistband. They then drove to the credit union parking lot, backed into a parking stall, got out of the car, and entered the credit union. Lucero approached one of the tellers and showed her the demand note while Martinez stayed near the entrance. After the teller complied with the note, Lucero put the money in her purse, and she and Martinez left the

credit union and drove back to Lucero's residence. There, they summoned Magalogo and purchased from him between two and four hundred dollars worth of methamphetamine, which they split between them. After Magalogo left, Lucero took enough money to buy her daughter a pizza, and Martinez left in Lucero's car with the remaining money. Lucero bundled the clothes they had worn during the robbery inside her blue sweatshirt and put the bundle in her basement.

Lucero's story was corroborated by the evidence found by the FBI as they continued their investigation. After Lucero's arrest, the FBI retrieved her wallet, containing two small plastic bags of methamphetamine, from her house. Sunglasses were found in the garbage can outside the house, where Lucero said she had discarded them. The bundle of clothes was found in Lucero's basement. There was no black bandanna inside the bundle, but a black bandanna was found in Lucero's car, which was in Martinez's possession at the time of his arrest. A Reams employee testified that the store carried the particular brands of sunglasses and bandanna that were found. When the agents who arrested Martinez asked him where the gun was, he pointed to the trunk of the car, where the agents found a .22 Ruger. Martinez also had $801 cash on his person. Inside the wad of bills was an empty small plastic bag that, according to lab tests, had contained methamphetamine. After Martinez's arrest, FBI agents followed Martinez's

girlfriend Crystal Keeley to her apartment and, after obtaining consent to search it, found a small notebook, on a back page of which was written the statement, "This is a robbery . . . ," in the all-caps style identified by Lucero as the style of the credit union robbery demand note.

The FBI subsequently obtained eyewitness identifications of Martinez as a perpetrator in two previous armed robberies in West Valley City, one at a Payless Shoesource on July 12, 2001, and another at a Papa John's Pizza on August 5, 2001. In both of those robberies, two men armed with a gun demanded the money in the stores' cash registers. One employee from each of those robberies identified Martinez in photo lineups that took place in mid to late October 2001. Jamie Lucero had given the FBI information implicating her acquaintance Steven Evans as the other perpetrator in the two robberies.

The charges brought against Martinez in connection with all three robberies were joined on the basis that they were "of the same or similar character" under Rule 8(a) of the Federal Rules of Criminal Procedure. Martinez's defense attorney moved to sever the charges relating to the Payless and Papa John's robberies from those relating to the credit union robbery, claiming unfair prejudice under Rule 14. The district court denied this motion.

In a series of pre-trial discovery requests, the defense asked the United States Attorney's Office to turn over "all investigative reports and other

documents," "[a]ny and all 302 reports authored by F.B.I. agents relating to any investigation in regard to charges filed," and "FBI Reports of Special Agent James Dempsey," one of the FBI agents who arrested Lucero, relating to Martinez's prosecution. The documents delivered by the U.S. Attorney's Office in response to these requests failed to include an FBI report by Special Agent Dempsey that requested authorization to pay the confidential informant Greg Magalogo $1000 for the information he provided about the credit union robbery. The document revealed that Magalogo had advised the police that "Demon" was Lucero's accomplice in the credit union robbery. Because the prosecution, hoping to keep Magalogo's identity confidential, did not plan to call Magalogo as a witness at trial, the defense received no information concerning Magalogo's involvement with the FBI's investigation.

At trial, the defense argued that although the details of all three robberies may be as the prosecution alleged, the prosecution could not prove that Martinez had participated in any of these robberies. According to the defense, the only evidence of Martinez's participation was Lucero's testimony, in regard to the credit union, and one photo identification, in regard to each of the other robberies. The defense challenged Lucero's testimony as self-serving and emphasized that Lucero had repeatedly lied in the past. The defense also challenged the credibility of the photo identifications because they took place two

to three months after the robberies and because of the likelihood of cross-racial misidentification by Caucasian witnesses of a Hispanic perpetrator.

When Lucero testified on the second day of trial, the defense counsel was surprised to hear her say that the FBI agents asked about "Demon" before she had identified Martinez as her accomplice. Still not knowing that the FBI agents had access to information provided by Magalogo before they questioned Lucero, the defense counsel believed he had caught Lucero in an outright lie on the stand and hoped to use this to his advantage. Thus, the next day, when cross-examining Lucero, the defense asked her to repeat this point several times. Then, when cross-examining Special Agent Dempsey, the defense asked a series of questions designed to show that the FBI's only information that Martinez was Lucero's accomplice came from Lucero. The defense asked: "So your testimony today is that the only person who could be identified [from the surveillance photos] was Jamie Lucero?" Special Agent Dempsey answered: "By Agent Juan Becerra," referring to the agent who had initially identified Lucero from the credit union robbery photos. The defense, intending it to be a rhetorical question, then asked: "Was somebody else to identify somebody?" R. Vol. IV at 352. At this point, the prosecutor interrupted and disclosed in a bench conference, outside the jury's

hearing, that Magalogo had identified Martinez from the credit union surveillance photos. [1]

After the bench conference, the defense counsel repeated his question to Special Agent Dempsey, eliciting the testimony that Magalogo had identified Lucero's accomplice as "Demon" before Lucero's arrest and that the agents had, as Lucero claimed, asked about "Demon" before she identified Martinez.

The defense counsel then requested another bench conference and moved for a mistrial based on the prosecutor's failure to disclose this information in pre-trial discovery. The defense counsel noted that he had been proceeding "on the theory that Ms. Lucero was the only one placing Mr. Martinez at [the credit union]" and argued that Martinez's case "is damaged irreparably." Id. at 363. The court acknowledged that the defense should have been told before trial that the FBI had someone in mind when they questioned Lucero and suggested a name to her because this information could be used by the defense to impeach Lucero's credibility. However, the court denied the defense's motion, reasoning that in a new trial, in order to use the exculpatory aspects of the information to its advantage, the defense would still have to reveal the inculpatory fact that

---

[1]It is not clear from the record whether Magalogo actually identified Martinez from the surveillance photos or based his identification solely on his visit to Lucero's residence following the robbery. Magalogo's testimony, described below, referred only to the latter.

someone else had identified Martinez as one of the credit union robbers. The court also noted that the defense would have the opportunity to attempt to use the information to its advantage in the remainder of the trial. In further cross-examination of Special Agent Dempsey, the defense did attempt to impeach Lucero's identification using the disclosed information. When Lucero was later recalled as a witness, the defense had an opportunity to cross-examine Lucero on this point as well but did not do so.

The next day, after the prosecution turned over to the defense the FBI report by Special Agent Dempsey concerning Magalogo's payment, the defense again moved for a mistrial. The court again denied the motion, concluding that, even though the prosecutor should have given the information to the defense before trial, its failure to do so was not significant in this case.

Following the disclosure, the district court had ordered the prosecution to have Magalogo transported from prison, where he was then incarcerated, to the courthouse so that the defense could interview him. After Magalogo was brought in, the FBI also re-interviewed him, and Magalogo told them that he had heard Martinez make an incriminating statement while at Lucero's residence. The prosecution then called Magalogo as a rebuttal witness to testify to this statement. The defense, on cross-examination, suggested that Magalogo had a motive to incriminate Martinez falsely because he and Martinez belonged to rival gangs.

At the conclusion of the five-day trial, the jury found Martinez guilty of all charges, and Martinez filed a timely notice of appeal.

**DISCUSSION**

**1. Delayed Disclosure of Impeachment Evidence**

Martinez argues first that the prosecution's belated disclosure of Magalogo's involvement with the FBI's investigation led the defense counsel into an "evidentiary ambush" that prevented him from effectively impeaching Lucero and resulted in the disclosure of incriminating information that would otherwise never have been revealed. Appellant's Br. at 23-27. According to Martinez, the district court's denial of Martinez's motion for a mistrial on this basis was in error either under Brady v. Maryland, 373 U.S. 83 (1963), or under procedural discovery rules.

**a. Brady Claim**

Brady recognized that a criminal defendant's right to a fair trial under the Due Process Clause requires the prosecution to disclose before trial "'evidence favorable to an accused,'" including evidence that could be used to impeach a government witness, "'where the evidence is material either to guilt or to punishment.'" Strickler v. Greene, 527 U.S. 263, 280 (1999) (quoting Brady, 373 U.S. at 87). The Supreme Court has explained the "three components of a true

-10-

Brady violation": (1) "The evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching;" (2) "that evidence must have been suppressed by the State, either willfully or inadvertently;" and (3) "prejudice must have ensued." Id. at 281-82. We review a district court's decision regarding an alleged Brady violation de novo. United States v. Combs, 267 F.3d 1167, 1172 (10th Cir. 2001).

The parties agree that the defense could use the belatedly disclosed evidence to impeach Lucero's credibility by arguing that she falsely identified Martinez as her accomplice in order to comply with the FBI's suggestion that it was "Demon." In that sense, the evidence is properly considered favorable to Martinez even though Magalogo's identification of the second credit union robber as "Demon," aka Martinez, clearly had at least as much inculpatory as exculpatory potential. The government concedes that this material should have been produced prior to trial. We therefore turn to the question of whether the delayed disclosure prejudiced the outcome of Martinez's trial.

The parties differ in regard to the standard they would have us apply to determine whether there has been prejudice in this case. Martinez argues that, because the defense here made a specific discovery request that the prosecution did not fulfill, there is prejudice if the suppressed evidence "' might have affected the outcome of the trial.'" Appellant's. Br. at 18 (emphasis added) (quoting

United States v. Abello-Silva, 948 F.2d 1168, 1180 (10th Cir. 1991)). In contrast, the government argues that because disclosure here was delayed rather than entirely withheld, there is no prejudice as long as the defense was able "'to make use of any benefits of the evidence.'" Appellee's Br. at 13 (quoting United States v. Scarborough, 128 F.3d 1373, 1376 (10th Cir. 1997) (further quotation omitted)). Neither party is correct. The Supreme Court has overruled the lower standard urged by Martinez, as we recognized in Smith v. Secretary of New Mexico Department of Corrections, 50 F.3d 801, 827 (10th Cir. 1995) (discussing United States v. Bagley, 473 U.S. 667 (1985)). Further, a fair reading of our previous cases concerning delayed disclosures shows that our focus in such cases is on "whether there is a reasonable probability that the outcome of [the trial] would have been different had the State disclosed this information earlier." Knighton v. Mullin, 293 F.3d 1165, 1172-73 (10th Cir. 2002). In other words, we consider "whether earlier disclosure would have created a reasonable doubt of guilt that did not otherwise exist." United States v. Rogers, 960 F.2d 1501, 1511 (10th Cir. 1992) (further quotation omitted); see Scarborough, 128 F.3d at 1376 ("Ultimately, . . . appellant has not shown that earlier disclosure of this material would have created any greater doubt about defendant's guilt or affected the result of the trial.").

Accordingly, we turn to consider whether, in this case, there is a reasonable probability that Martinez would have been acquitted had the prosecution not delayed its disclosure of Magalogo's identity and involvement in the FBI investigation. Martinez asserts prejudice on two separate bases. First, he argues that the defense was unable to use the evidence effectively to impeach Lucero because the way in which the evidence was revealed "emphasized" its "prejudicial aspects" while "neutraliz[ing]" its "exculpatory aspects." Appellant's. Br. at 26-27. In fact, however, as indicated above, it was the defense counsel's questioning of Special Agent Dempsey, _after_ being informed in a bench conference that Magalogo had identified Martinez, that brought this identification before the jury. We must therefore attribute the emphasis on the prejudicial aspects of this evidence not to the prosecution's delay but to the defense's unwise tactical choice on cross-examination. Moreover, even had defense counsel been aware of this evidence before trial, there is no suggestion that his overall strategy, which was already focused on impeaching Lucero's credibility, would have been different. Taking the totality of the circumstances into account, including the evidence found in Martinez's control at the time of his arrest that corroborated Lucero's story, the impeachment value of this evidence was very slight. Thus, even if the defense had presented the evidence in the most effective way possible, we cannot conclude that it would have had any impact on the case's outcome.

Second, Martinez argues that if not for the delayed disclosure of this information, Magalogo would never have been transported from prison to the court so that defense counsel could interview him, which, rather than helping the defense to respond to the disclosure, led the prosecution "to learn of and then elicit [in court] additional damaging testimony regarding a statement made by Mr. Martinez which implied his participation in the robbery." Id. at 27. Martinez cites no cases to support the proposition that an assessment of prejudice under Brady includes the impact of otherwise admissible inculpatory evidence that, but for the delayed disclosure of exculpatory evidence, would have remained unknown to the prosecution. Such a proposition goes beyond the due process concern under Brady with ensuring that the defendant "'received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" Strickler, 527 U.S. at 290 (quoting Kyles v. Whitley, 514 U.S. 419, 434 (1995)). Our previous Brady cases have only examined the potential use a defendant could make of exculpatory material, not the defendant's potential avoidance of inculpatory material. We do not believe that Martinez can claim prejudice under Brady simply because of the prosecution's unexpected discovery and presentation to the jury of new incriminating evidence.

We therefore affirm the district court's denial of a mistrial under Brady.

### b. Discovery Sanction

Martinez also argues that the district court should have granted his motion for a mistrial as a discovery sanction because the prosecution's failure to give the defense the FBI report on Magalogo before trial was a violation of the government's "open file" policy. We review a district court's refusal to impose a discovery sanction for abuse of discretion. United States v. Franklin, 704 F.2d 1183, 1191 (10th Cir. 1983). In exercising its broad discretion to impose sanctions on the government for failure to comply with a discovery order, a district court should consider: "(1) the reasons the government delayed producing the requested materials, including whether or not the government acted in bad faith . . . ; (2) the extent of prejudice to the defendant as a result of the government's delay; and (3) the feasibility of curing the prejudice with a continuance." United States v. Peveto, 881 F.2d 844, 863 (10th Cir. 1989). Here, the record shows that the district court carefully considered the nature of the evidence disclosed, the effect of the delayed disclosure, and how best to cure any resulting prejudice before concluding that a mistrial was unwarranted. This conclusion was not an abuse of the court's discretion.

## 2. Refusal to Sever

Martinez next argues that the joinder of all charges in a single trial was unfairly prejudicial and that the district court should therefore have granted his motion to sever the charges related to the credit union robbery from those related to the other two robberies. Rule 14 permits a district court to order separate trials "[i]f the joinder of offenses . . . appears to prejudice a defendant . . . ." Fed. R. Crim. P. 14(a). "The decision whether to grant or deny severance is in the sound discretion of the trial court, and will not be disturbed on appeal unless there is an affirmative showing of abuse of discretion." United States v. Parra, 2 F.3d 1058, 1062 (10th Cir. 1993) (further quotation omitted). "The burden of the defendant to show an abuse of discretion in this context is a difficult one." Id. (further quotation omitted).

Martinez argues that joinder was prejudicial in this case because the evidence that Martinez was in possession of a firearm at the time of his arrest soon after the credit union robbery might lead the jury to infer that he had a criminal disposition and was thus likely to have committed the other two robberies. Martinez also argues that the theory of defense he presented in connection with the credit union robbery—that the main witness was lying—and the theory he used in connection with the other robberies—that the eyewitnesses

-16-

misidentified him—were incompatible and "los[t] all credibility when joined together." Appellant's Br. at 31.

We have previously recognized that where, as here, "joinder of offenses is based upon their 'same or similar character,' the prejudice to the defendant is more likely since proof of one crime may tend to corroborate the commission of the other crime in violation of the evidentiary rules." United States v. Muniz, 1 F.3d 1018, 1023 (10th Cir. 1993). By itself, however, the "'spillover' effect" of damaging evidence is insufficient to warrant reversal of a district court's denial of severance. United States v. Furman, 31 F.3d 1034, 1037 (10th Cir. 1994). Thus, we have upheld a district court's refusal to sever such offenses where the "counts were separate and distinct, and the evidence presented at trial was not too confusing or unfairly overlapping," and "the case for each count was strong enough on its own." Muniz, 1 F.3d at 1023.

These factors are also at work here. Martinez does not allege that the government was "attempting to strengthen a weak case by joining it with a strong case." Id. The evidence related to each robbery was presented separately and was not confusing. We are unpersuaded that Martinez's defense strategies were unduly hampered as a result of their presentation in a single trial. Martinez has not met the heavy burden required for a reversal on this claim. We therefore affirm the district court's refusal to sever.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge