# UNITED STATES COURT OF APPEALS

# FOR THE TENTH CIRCUIT

CYRIL WAYNE ELLIS,

      Petitioner - Appellant,

v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

      Respondent - Appellee.

No. 01-6004

## ORDER

Filed March 4, 2003

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**, Circuit Judge.

Appellee's petition for rehearing is denied.[1]

The suggestion for rehearing en banc was transmitted to all of the judges of the court who are in regular active service. A poll was requested and a majority of the active judges voted to deny rehearing en banc.[2]

---

[1]Judge Brorby voted to grant rehearing.

[2]Judges Kelly, Briscoe and O'Brien voted to grant rehearing en banc. Judge Henry is recused in this matter.

The panel opinion, filed December 10, 2002, is hereby modified in the following regards:

On page 10, the last sentence of first paragraph has been deleted ("However, the state court's determination ... State court proceeding"). Inserted in its place, Le v. Mullin, 311 F.3d 1002, 1010 (10th Cir. 2002).

On page 11, the first sentence of first paragraph has been deleted ("We conclude that the OCCA ... at the time of the incident."). The word "Ellis" is inserted in the first sentence following this deleted text. The words "The" and "report" have been added in the eighth line from the bottom of page 11.

A minor change in the dissent has also been made by Judge Brorby.

A copy of the modified opinion has been attached to this order. All recipients of the opinion are directed to discard any previous copies.

Entered for the Court
PATRICK FISHER, Clerk of Court


by: /s/ Ardell Schuler
        Deputy Clerk

**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 10 2002**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

CYRIL WAYNE ELLIS,

        Petitioner - Appellant,

v.

MIKE MULLIN, Warden, Oklahoma
State Penitentiary,

        Respondent - Appellee.

No. 01-6004

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. No. CIV-97-1386-R)**

Scott W. Braden, Assistant Federal Public Defender, Oklahoma City, Oklahoma, for
Petitioner-Appellant

Nancy E. Connally, Assistant Oklahoma Attorney General (W.A. Drew Edmondson,
Oklahoma Attorney General, and Jennifer B. Miller, Assistant Oklahoma Attorney
General, on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee

Before **EBEL**, Circuit Judge, **BRORBY**, Senior Circuit Judge, and **MURPHY**, Circuit
Judge.

**EBEL**, Circuit Judge.

Cyril Wayne Ellis is a schizophrenic man who went on a ninety-minute killing spree that left three people dead and four wounded in Oklahoma in 1986. Ellis received three death sentences. This case comes to us on appeal from the district court's denial of Ellis's petition for habeas corpus under 28 U.S.C. § 2254. Ellis raises a host of claims in his habeas petition, most of them related to his mental illness.[1] We conclude that the trial court improperly excluded critical evidence of Ellis's insanity in violation of <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973), and we reverse.

---

[1] Ellis asserts six grounds for reversal of the district court's denial of habeas relief. First, he argues that his trial counsel was ineffective under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984),for failing to discover evidence that Ellis had been diagnosed as schizophrenic only weeks before the incident, as well as other mitigating evidence regarding his life history (and that appellate counsel was ineffective for failing to raise this issue). Second, he argues that he was wrongly denied the opportunity to voir dire potential jurors individually, outside the presence of the rest of the venire, regarding their views on the death penalty. Third, he challenges the insanity instruction given at trial. Fourth, he argues that the exclusion of evidence of a pre-trial psychiatric examination resulting in a schizophrenia diagnosis prevented him from presenting his defense in violation of <u>Chambers v. Mississippi</u>. Fifth, he argues that the trial court violated <u>Cooper v. Oklahoma</u>, 517 U.S. 348 (1996), by applying an unconstitutional burden of proof for competency. Sixth and finally, he argues that under <u>Ford v. Wainwright</u>, 477 U.S. 399 (1986), he cannot be executed because he is insane. Because we conclude below that Ellis is entitled to habeas relief on the fourth issue, we do not reach his remaining claims.

## I. BACKGROUND

*A. The shootings*

The facts regarding the killings are undisputed. On January 26, 1986, Ellis argued with his fiancée Cheryl James and struck her. Later that day he felt remorseful and consumed an overdose of pills in an apparent suicide attempt. He was hospitalized and admitted to the psychiatric ward. Cheryl visited him at the psychiatric ward for several hours on January 29, and when she left he came running out after her and forced her to drive them away. Cheryl became afraid and found help, but when the police arrived she declined to press charges. Later that day, Ellis tried to buy a gun, discovered he did not have enough money, and borrowed a gun from one of the store clerks instead.

The next morning, Ellis was driving in his car when he noticed Cheryl riding in a car with her sister's boyfriend, Robert Dumas. Ellis pulled alongside and Dumas pulled away. As Ellis sped after him, Dumas drove into a yard and Ellis blocked him in. Cheryl fled on foot, but Ellis stopped Dumas and ordered him into the trunk of the car. From inside, Dumas began pounding on the trunk, whereupon Ellis opened the trunk, said "I see you don't want to live," shot him twice, and closed the trunk. Dumas survived.

Ellis proceeded to Dumas's house. Cheryl was not there, but Cheryl's sister Teresa Thomas was there with Thomas's six-year old daughter Tameca. Ellis chased Thomas through the house, shooting her repeatedly and fatally. He also shot Tameca three times, but she lived.

Ellis went home to get more ammunition, then went to his place of employment. Seeing employee Gordon Moore in the parking lot, Ellis ordered him to his knees and shot him in the face. Moore survived. Ellis went inside and shot and killed another employee, Carl Lake, with two shots. He stepped out to the loading dock, fired repeatedly, and killed James Rider. Ellis got into his car and began to drive away, shooting and injuring his final victim, Ancil Davis, on the way out.

*B. Trial*

Ellis was charged with capital murder. Prior to trial, the trial judge ordered that Ellis be examined by doctors at the Oklahoma department of mental health. The court stated that "there is a doubt as to the competency of the said CYRIL WAYNE ELLIS, by reason of the actions of the defendant and statements regarding the defendant's ability to understand the proceedings against the defendant and the defendant's capability of knowing right from wrong at the time these alleged actions took place." In addition to questions clearly regarding competency to stand trial, the court also directed the doctors to address: "Was this person competent at the time these acts were alleged to have been committed?"

Pursuant to this order, Ellis was admitted to Eastern State Hospital on March 5, 1986 (roughly a month and a half after the shootings) and was seen until his release on

April 2.  Dr. R.D. Garcia,[2] Chief Forensic Psychiatrist at the hospital, prepared a

discharge report.  In this report, Dr. Garcia stated a final diagnosis of "Schizophrenia,

paranoid type, chronic in complete remission spontaneously without any medication."

Dr. Garcia's report offered several relevant observations:

> He had a severe dissociative disorder in the past with psychogenic headaches, and may have been completely depersonalized at the time of the incident.  At least he claimed repeatedly, emphatically, without changing his viewpoint and report that he completely blocked out and did not remember the detail of the shooting. . . .
> . . . .
> His thought content on the mental status[3] revealed he was hearing voices, felt that no one cares about him, he might as well do away with himself, and he cannot trust people anymore.  He was suspicious and paranoid.  He felt his body was frozen by the demons and spirits trying to take over his body and his spirit.  He began feeling that even the doctors were against him and he began talking and thinking about it since December of 1985 . . . .
> . . .
> . . . . Much, much improved spontaneously [upon discharge]. . . . Only suicidal thoughts when he left.  Competent in the psychological, legal, and sociological point of view at this time.  He may have had history of schizophrenic or schizophreniform behavior in the past, in complete remission at the present time.  He is definitely competent to stand trial at the present time, knowing right from wrong and capable of testifying in his defense.

Dr. Garcia died prior to trial and thus was unavailable to testify.

---

[2] Dr. Garcia, we have noted, "was himself suffering from severe untreated bipolar disorder" during this time.  Williamson v. Ward, 110 F.3d 1508, 1519 (10th Cir. 1997).  Neither party to the present appeal argues that his conclusions (some of them favorable to Ellis, some favorable to the State) should be deemed unreliable.

[3] This refers to the status obtained near the beginning of the mental evaluation.

At the guilt phase of the trial, Ellis's sole strategy was to argue that he was insane when he committed the murders. To this end, Ellis elicited testimony from several witnesses, none of them medical professionals, regarding events in the weeks prior to the shootings. Summarized in approximate chronological order, there was testimony that in the weeks immediately prior to the shooting Ellis passed out in the bathroom at work; was hospitalized for a head injury; suffered a seizure while driving; was hospitalized for a deliberate overdose of pills; was transferred to the psychological ward at the hospital the day before the shootings; told his sister he was hearing voices; escaped from the psychological ward and kidnaped his fiancée; was "in a daze," "like I wasn't even there talking to him," "confused," "sat there and stared directly at me, like straight through," and "lost" after the confrontation with his fiancée and police the day before the shootings. In addition to this testimony, Ellis attempted also to introduce Dr. Garcia's report into evidence, to which the prosecution objected only on grounds of relevancy and Rule 403. The trial court sustained the objection because the report "only goes as to his competency to stand trial, and his opinion does not go to the insanity at the time he committed the acts."

In its closing argument, the prosecution argued that Ellis had failed to establish his insanity, emphasizing the lack of evidence from medical professionals:

> We know that he was in the hospital. We know that he was in the psych ward, that he had voluntarily committed himself to that establishment. You have heard no evidence from any professional, nurse, doctor, of any sort, to say this man on that day did not know right from wrong. . . . I submit to you,

folks, that you have heard absolutely no evidence, zero evidence, that this man did not know right from wrong on the day of that shooting.

Indeed, the prosecution argued forcefully that Ellis was faking insanity, stating, "This insanity defense that Mr. Ellis has brought to you is what I refer to as instant insanity. It's like instant mashed potatoes." Summarizing evidence that Ellis acted deliberately and understood events around him,[4] the prosecution concluded, "Again, instant insanity, insanity to his liking, insanity to justify these acts. That's what he is doing, folks: . . . He's a con." The defense waived closing argument.

The jury found Ellis guilty of all three counts of first degree murder and all four counts of shooting with intent to kill.

At the sentencing phase of the trial, Ellis offered additional testimony regarding his insanity from lay witnesses who believed Ellis had "a condition" and "deep emotional problems," and who had heard Ellis threaten suicide. Ellis's minister's wife testified that in a Sunday prior to the shooting, Ellis stood up in church and wept, saying "this thing that's in my mind is trying to get me to destroy myself . . . I need help." Ellis's attorney

---

[4] Representative of the prosecution's summary is the following:

> Then the voice leaves him, and I guess he runs around the back of the house to see what is happening. Then the voice comes back again, and he runs over and he shoots Teresa three or four more times.

> The voice leaves. Then he sees Tameca; and the voice comes back, and he shoots Tameca. That's the way his insanity is working, folks.

then introduced the Garcia report that the court had excluded at the first phase. In addition, Ellis presented testimony from family and friends who cared about him and introduced evidence showing that he was active in his church, volunteered for children, helped a car-accident victim, had no prior felony convictions, and showed remorse when questioned by police. After the jury deliberated for over eighteen hours, Ellis received death sentences on each of the three murder counts and sentences of between 1,000 and 3,000 years on each of the shootings with intent to kill charges.

## C. *Appeal and post-conviction challenges*

Ellis's direct appeal was denied. Ellis v. State, 867 P.2d 1289 (Okla. Crim. App. 1992). The Oklahoma Court of Criminal Appeals (OCCA) rejected Ellis's argument that the Garcia report should have been admitted at the guilt phase, reasoning as follows:

> Nothing in the Eastern State Hospital records was directed to the question of sanity, which is whether appellant was capable of knowing the wrongfulness of his acts when he committed them. See 21 O.S.1981, § 152(4). Rather, the examination was directed solely to the question of competency, i.e. whether appellant had the ability at the time of trial to understand the nature of the charges and proceedings brought against him, and was able to effectively and rationally assist in his defense. See 22 O.S.1981, § 1175.1. Appellant sought to introduce the records merely because they were authentic. Any probative value was substantially outweighed by the danger of misleading the jury and confusing the issues of competency and sanity, 12 O.S.1981, § 2403, and we find that the trial court ruled properly.

Id. at 1296-97. Ellis's subsequent petition for post-conviction relief was denied. Ellis v. State, 941 P.2d 527 (Okla. Crim. App. 1997).

Ellis then filed the present habeas petition in federal district court, in which he again challenged, inter alia, the exclusion of the Garcia report. The district court rejected all of Ellis's claims. Addressing Ellis's Chambers claim regarding the exclusion of the Garcia report, the court adopted the OCCA's reasoning in its entirety. It acknowledged in a footnote that the trial court directed the doctors to assess competency at the time the acts were committed, but stated that "[i]t is nevertheless clear that Dr. Garcia's report and the accompanying staff notes are addressed to the issue of competency to stand trial, and not to the insanity defense."

We have jurisdiction under 28 U.S.C. § 2253. Because Ellis filed his habeas petition on December 19, 1997, after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), AEDPA applies.

## II. *CHAMBERS* CLAIM

Ellis argues that the trial court's exclusion of Dr. Garcia's pre-trial diagnosis of schizophrenia denied him due process under Chambers v. Mississippi, 410 U.S. 284 (1973), and its progeny by preventing him from presenting his insanity defense. We agree.

In his brief to the OCCA on direct appeal, Ellis challenged the exclusion of the Garcia report on various grounds, including Chambers. The OCCA, however, upheld the

exclusion without any reference to Ellis's Chambers claim, holding only that the report properly was excluded under state law. Ellis v. State, 867 P.2d 1289, 1296-97 (Okla. Crim. App. 1992) (concluding that, under 12 Okla. Stat. § 2403 (1981), the evidence properly was excluded because its probative value was substantially outweighed by the danger of confusing the jury). Because the OCCA did not consider Ellis's federal constitutional claim, our review is de novo. Romano v. Gibson, 239 F.3d 1156, 1166 (10th Cir. 2001) (reviewing de novo where "on direct appeal, [petitioners] did challenge the trial court's exclusion of this evidence on federal constitutional grounds, [but] the [OCCA] addressed these claims only under state law"). Le v. Mullin, 311 F.3d 1002, 1010 (10th Cir. 2002).

We have stated that "state evidentiary determinations ordinarily do not present federal constitutional issues . . . . However, the Supreme Court, in, e.g., Chambers v. Mississippi, 410 U.S. 284, 302 (1973), and Green v. Georgia, 442 U.S. 95, 97 (1979) (capital sentencing proceeding), has provided an exception, under some circumstances, if a state court applies the State's evidentiary rules unfairly to prevent a defendant from presenting evidence that is critical to his defense." Romano, 239 F.3d at 1166. "[T]o determine whether a defendant was unconstitutionally denied his or her right to present relevant evidence, we must balance the importance of the evidence to the defense against the interests the state has in excluding the evidence." Richmond v. Embry, 122 F.3d 866, 872 (10th Cir. 1997). Further:

- 10 -

> [T]o establish a violation of . . . due process, a defendant must show a denial of fundamental fairness . . . . It is the materiality of the excluded evidence to the presentation of the defense that determines whether a petitioner has been deprived of a fundamentally fair trial. Evidence is material if its suppression might have affected the outcome. In other words, material evidence is that which is exculpatory–evidence that if admitted would create reasonable doubt that did not exist without the evidence.

Richmond, 122 F.3d at 872 (citations and internal quotation marks omitted). See also Romano, 239 F.3d at 1168 ("[W]e need ask no more than whether the trial court's application of this state evidentiary rule excluded critical exculpatory evidence.").

The Ellis report was prepared in response to the trial court's specific request for an assessment of Ellis's competency at the time of the shootings, i.e. legal sanity. The report diagnosed Ellis as paranoid schizophrenic. It classified his paranoid schizophrenia as "chronic," a term defined in the then-current Diagnostic and Statistical Manual of Mental Disorders (3d ed.-Rev. 1987) (DSM-III-R) as having shown signs of the mental disturbance more or less continuously for more than two years. The report stated that Ellis "had a severe dissociative disorder in the past" and he "may have been completely depersonalized at the time of the incident." The report observed that at the time of the initial status report, Ellis revealed he was hearing voices, and that he "felt his body was frozen by the demons and spirits trying to take over his body." We cannot agree that "[n]othing" in the report "was directed to the question of sanity." Ellis, 867 P.2d at 1296.

Moreover, we conclude that the Garcia report was exculpatory – and thus implicated the fundamental fairness of the trial – because it would have "create[d]

- 11 -

reasonable doubt that did not exist without" it. Richmond, 122 F.3d at 872. With Dr. Garcia's diagnosis and observations excluded during the guilt phase, Ellis's case for insanity was highly vulnerable to the argument, seized upon by the prosecution in its closing argument as quoted above, that Ellis only began faking mental illness around the time of the killings. The prosecution emphasized during the guilt phase that Ellis introduced no diagnosis of insanity and no testimony of medical professionals that he was insane. See also Mem. Op. & Order at 46-47 (stating that insanity evidence presented during guilt phase "does not establish that either his alleged head injury, his emotional state, or any mental illness from which he suffered at the time of the shooting were so severe as to prevent him from understanding the nature and consequences of his acts, or from knowing that they were wrong" and "[t]he evidence was clearly not sufficient to enable a reasonable jury to find the Petitioner not guilty by reason of insanity"). The Garcia report would have provided the jury with objective, professional validation of Ellis's longstanding mental illness, validation provided by the Eastern State Hospital's chief forensic pathologist based on extended observation. It is reasonably probable that the Garcia report would have put Ellis's other evidence of mental illness in an altogether different light to the jury.

We reject the district court's conclusion that the value of the Garcia report to the defense was outweighed by the danger of misleading the jury and confusing the issues of competency and sanity. We note that the jury could have been instructed on the difference

and ordered not to blur the two, and "[a] jury is presumed to follow its instructions." Weeks v. Angelone, 528 U.S. 225, 234 (2000). More significantly, under the circumstances any meaningful risk of confusion weighed entirely against Ellis. The Garcia report tended to show that Ellis was insane at the time of the crime but was competent now to stand trial. If, as the OCCA and the district court posit, the jury was irremediably likely to be unable to distinguish sanity from competency, their confusion could only lead them to conclude that Ellis was sane then because he is competent now. In theory, of course, the jury could mistakenly conclude that Ellis is incompetent now because he was insane then, but such a conclusion would have been altogether irrelevant: the competency issue was not before the jury because it already had been resolved by the court prior to trial. Thus, even if we were to assume that an instruction could not cure the risk of confusion regarding competency and sanity, it is clear that Ellis alone bore that risk. The state's interest in excluding the Garcia report clearly was outweighed by Ellis's interest in presenting it.

Accordingly, we conclude that Ellis's due process right to present evidence critical to his defense was violated by the trial court's exclusion of the Garcia report during the guilt phase of the trial.

### III.  CONCLUSION

We REVERSE the judgment of the district court insofar as it denied habeas relief as to the guilt phase of Ellis's trial.  We grant the writ subject to the condition that the state retry Ellis within a reasonable time or be subject to further federal proceedings to consider his release.  See Fisher v. Gibson, 282 F.3d 1283, 1311 (10th Cir. 2002).

No. 01-6004 – *Ellis v. Mullin*

**BRORBY**, Senior Circuit Judge, dissenting.

I respectfully dissent. I conclude the Oklahoma Court of Criminal Appeals' decision is an "adjudication on the merits" under the Antiterrorism and Effective Death Penalty Act. I would also uphold the Oklahoma court's factual determination concerning Dr. Garcia's report, especially under the Act's deferential standards in §§ 2254(d)(2) and 2254(e)(1). In addition, I conclude the Oklahoma trial court's exclusion of Dr. Garcia's report was not egregious enough to constitute a due process violation under *Chambers v. Mississippi*, 410 U.S. 284 (1973).

**Adjudication on the Merits**

The Antiterrorism and Effective Death Penalty Act requires us to deny a habeas petition when a state court adjudicated the petitioner's claim on the merits unless the state court adjudication "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," *see* 28 U.S.C. § 2254(d)(2). We "presume[]" state court factual determinations are correct unless the petitioner rebuts the presumption with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

The Oklahoma trial court excluded Dr. Garcia's report because it was irrelevant to the issue of sanity. The court's ruling was based on its factual determination nothing in the report discussed sanity, *i.e.*, whether Mr. Ellis knew right from wrong at the time of the incident. *See Ellis v. State*, 867 P.2d 1289, 1296 (Okla. Crim. App. 1992). In fact, even when questioned by the court, Mr. Ellis could point to nothing in the report bearing upon whether he knew right from wrong at the time of the incident. *Ellis v. Ward*, No. CIV-97-1386-R, slip op. at 50 (W.D. Okla. Oct. 10, 2000).

Mr. Ellis appealed to the Oklahoma Court of Criminal Appeals, arguing the report's exclusion violated due process. The Oklahoma Court of Criminal Appeals, however, affirmed the trial court's ruling, concluding "[n]othing" in Dr. Garcia's report "was directed to the question of sanity"; rather, the report "was directed solely to the question of competency." *Ellis*, 867 P.2d at 1296-97. The court also observed any probative value of Dr. Garcia's report was "substantially outweighed by the danger of misleading the jury and confusing the issues of competency and sanity." *Id*.

Seeing only references to state law in the Oklahoma Court of Criminal Appeals' analysis, the majority concludes the court did not adjudicate the due process claim on the merits and reviews the claim de novo. I disagree and conclude deference is appropriate under the Antiterrorism and Effective Death Penalty Act.

-2-

The majority cites in support of its conclusion a line of decisions withholding deference from state court decisions citing only state law (*Romano v. Gibson*, 239 F.3d 1156, 1166 (10th Cir.), *cert. denied*, 122 S. Ct. 628 (2001)). This would be controlling if our decisions were consistent on the issue of deference under the Antiterrorism and Effective Death Penalty Act; unfortunately, they are not. Some decisions grant deference to state court decisions citing federal law, *see, e.g., Kanikaynar v. Sisneros*, 190 F.3d 1115, 1117-18 (10th Cir. 1999), *cert. denied*, 638 U.S. 1090 (2000), state court decisions lacking analysis and citations to law, *see, e.g., Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 569-70 (10th Cir. 2000). *cert. denied*, 531 U.S. U.S. 1161 (2001), *abrogated on other grounds* by *McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001); *Aycox v. Lytle*, 196 F.3d 1174, 1177-78 (10th Cir. 1999), and state court decisions citing only state law, *see, e.g., Revilla v. Gibson*, 283 F.3d 1203, 1212-13 (10th Cir.), *cert. denied*, 2002 WL 3118964 (U.S. Nov. 12) (No. 02-6372) (2002); *Mitchell v. Gibson*, 262 F.3d 1036, 1052-53 (10th Cir. 2001); *Romano,* 239 F.3d at 1164. In contrast, other decisions withhold deference from state court decisions lacking analysis and citations to law, *see, e.g., Smith v. Scott*, 223 F.3d 1191, 1193 n.1 (10th Cir. 2000), and state court decisions citing only state law, *see, e.g., Knighton v. Mullin*, 293 F.3d 1165, 1171 (10th Cir. 2002); *Neill v. Gibson*, 278 F.3d 1044, 1053 (10th Cir. 2001), *cert. denied*, 123 S. Ct. 145 (2002); *Romano*, 239 F.3d at 1166. While resolving this apparent conflict in our decisions may be an appropriate subject for the en banc court, most of our cases can be reconciled under the

-3-

following approach: We will grant deference to a state court decision under the Antiterrorism and Effective Death Penalty Act unless the decision provides some affirmative indication the state court did not consider the federal claim. *See Aycox*, 196 F.3d at 1177 (granting deference where "[t]here is no evidence here that the state court did not consider and reach the merits of [the] claim"). We have found such affirmative indications in the past where the state court did not consider the federal claim because of a procedural bar, *see, e.g., Sallahdin v. Gibson*, 275 F.3d 1211, 1234-35 (10th Cir. 2002), where the state court expressly addressed every claim except one, *see, e.g., Duckett v. Mullin*, 306 F.3d 982, 991 n.1 (10th Cir. 2002), and where the state court denied the claim on a state law ground unrelated to the federal issue, *see, e.g., Neill*, 278 F.3d at 1053-54. On the other hand, if a decision lacks such affirmative indications, we will grant it deference under the Act, even if the decision is perfunctory. *See Aycox*, 196 F.3d at 1177-78.

I do not think, however, that a state court decision citing only state law automatically indicates the state court did not adjudicate the federal claim on the merits. Nor do I think our precedent requires such a result. Of course, if a state court decision denies a claim on a state law ground unrelated to the federal issue, deference is not appropriate. *See, e.g., Neill*, 278 F.3d at 1053-54. However, if a state court decision denies a claim on a state law ground rendering the federal claim meritless, or otherwise

-4-

resulting in its denial, the state court decision lacks any affirmative indication the state court did not consider the federal claim. *See generally, Romano*, 239 F.3d at 1164 (reviewing under § 2254(d) a state court decision citing only state law where the state standard was stricter than the federal standard).

Here, the Oklahoma trial court found nothing in Dr. Garcia's report discussed Mr. Ellis' sanity at the time of the incident. Based on this finding, the court concluded the report was irrelevant. The Oklahoma Court of Criminal Appeals agreed with the trial court's factual finding and conclusion. *See Ellis*, 867 P.2d at 1296-97. Mr. Ellis does not have a due process right to present irrelevant evidence. *See, e.g., Rock v. Arkansas*, 483 U.S. 44, 55 (1987) (discussing a defendant's constitutional right to present relevant testimony); *Richmond v. Embry*, 122 F.3d 866, 872 (10th Cir. 1997) (same), *cert. denied*, 522 U.S. 1122 (1998). Therefore, Mr. Ellis' due process claim has no merit. Since the Oklahoma Court of Criminal Appeals' decision lacks an affirmative indication the court did not consider the federal claim, the decision deserves deference under the Antiterrorism and Effective Death Penalty Act.

**Review of the Oklahoma Courts' Factual Determination**

The Oklahoma Court of Criminal Appeals' decision denying Mr. Ellis' claim was based on its agreement with the trial court's factual determination that nothing in Dr.

Garcia's report discusses Mr. Ellis' sanity at the time of the incident. *Ellis*, 867 P.2d at 1296-97. Mr. Ellis challenges this factual determination, triggering review under §§ 2254(d)(2) and 2254(e)(1) of the Antiterrorism and Effective Death Penalty Act. We may grant Mr. Ellis' habeas petition only if we conclude the factual determination is unreasonable in light of the evidence, presuming the factual determination correct unless Mr. Ellis rebuts the determination with clear and convincing evidence. *See* 28 U.S.C. § 2254(d)(2) & (e)(1). Mr. Ellis did not meet this standard.

The majority disagrees with the Oklahoma court's factual determination that "nothing" in Dr. Garcia's report "was directed to the question of sanity." *Ellis*, 867 P.2d at 1296. (Majority at 13.) The majority overlooks our obligation to presume all state court factual determinations are correct unless the presumption is rebutted with clear and convincing evidence. *See* 28 U.S.C. § 2554(e)(1). This presumption and standard applies regardless of whether our review is de novo or deferential under § 2254(d). *See Hooks*, 184 F.3d at 1223. Even reviewing the Oklahoma court's factual determination de novo, however, I think the court was correct in finding Dr. Garcia's report is not directed to the question of sanity. Nothing in the report indicates whether Mr. Ellis was capable of knowing right from wrong at the time of the incident. Dr. Garcia's report concludes only that Mr. Ellis was "definitely competent to stand trial." Competency is not the same as

-6-

sanity. *Compare* Okla. Stat. tit. 21, § 152(4) (2002) *with* Okla. Stat. tit. 22, § 1175.1 (2002).

The majority is concerned certain statements and observations in Dr. Garcia's report may reflect on Mr. Ellis' sanity at the time of the incident. However, these statements offer no conclusions as to sanity and merely repeat what Mr. Ellis himself explained to the doctor, *i.e.*, he did not remember the shootings, he borrowed a gun to kill himself, he heard voices, he was suspicious and paranoid, and he thought demons and spirits were taking over his body. Dr. Garcia's few observations in the report also offer no conclusions as to Mr. Ellis' sanity: Mr. Ellis had a severe dissociative disorder in the past, Mr. Ellis may have been completely depersonalized at the time of the incident, and Mr. Ellis had chronic paranoid type schizophrenia. Nowhere in the report is there a discussion or conclusion as to whether Mr. Ellis knew the wrongfulness of his acts at the time of the incident. The statements and observations in the report merely informed Dr. Garcia's final conclusion: While Mr. Ellis "may have had history of schizophrenic ... behavior[,] [h]e is definitely competent to stand trial."

The majority also rejects the Oklahoma Court of Criminal Appeals' observation that "[a]ny probative value [of Dr. Garcia's report] was substantially outweighed by the danger of misleading the jury and confusing the issues of competency and sanity." *See*

-7-

*Ellis*, 867 P.2d at 1297. In contrast to the majority, I believe there was a danger the jury would take these statements in Dr. Garcia's report out of the context of competency to support a finding of legal insanity, even though nothing in the report indicates whether Mr. Ellis knew right from wrong at the time of the incident. The report does not explain what it means to have a "dissociative disorder," to have "schizophrenia," or to be "depersonalized." Furthermore, the report does not offer an opinion as to whether Mr. Ellis had any of these conditions at the time of the incident. Even assuming he did, the report does not explain whether these conditions could have or did have an impact on Mr. Ellis' sanity at the time of the incident. In light of the focus of the report and the cursory nature of Dr. Garcia's observations, I do not think the trial court erred in excluding the report.

**The *Chambers* analysis**

The majority holds the Oklahoma trial court's exclusion of Dr. Garcia's report violated due process under *Chambers v. Mississippi*, 410 U.S. 284 (1973). I cannot agree that the trial court's exclusion in this case is egregious enough to constitute a due process violation.[1] Claims of error based on evidentiary rulings are matters of state law which are

_____

[1] I also conclude the Oklahoma Court of Criminal Appeals' decision denying Mr. Ellis' due process claim was not contrary to or an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d)(1). Even accepting the majority's conclusion de novo review applies, I cannot agree that the trial court's exclusion of Dr. Garcia's report violated the

(continued...)

-8-

generally not cognizable in federal habeas corpus proceedings, *see Romano*, 239 F.3d at

1166, and ordinarily do not rise to the level of a constitutional violation, *see Crane v.

Kentucky*, 476 U.S. 683, 689 (1986). Mr. Ellis may obtain habeas relief for an improper

state evidentiary ruling "only if the alleged error was so grossly prejudicial [that it] fatally

infected the trial and denied the fundamental fairness that is the essence of due process."

*Revilla*, 283 F.3d at 1212 (alteration in original; quotation marks and citation omitted).

The category of infractions violating fundamental fairness is very narrow, *see Bullock v.

Carver*, 297 F.3d 1036, 1055 (10th Cir.), *cert. filed*, (U.S. Oct. 21) (No. 027110) (2002),

and Mr. Ellis' due process claim falls outside this category.


The Supreme Court recognized *Chambers* represented "an exercise in highly case-

specific error correction." *Montana v. Egelhoff*, 518 U.S. 37, 52 (1996). The Court

explained:

> [T]he holding of *Chambers* – if one can be discerned from such a fact-
> intensive case – is certainly not that a defendant is denied a fair opportunity
> to defend against the State's accusations whenever critical evidence
> favorable to him is excluded, but rather that erroneous evidentiary rulings
> can, in combination, rise to the level of a due process violation.

*Id*. at 53 (quotation marks omitted). *Chambers* and its progeny stand for the limited

proposition that a state court's exclusion of highly exculpatory evidence, critical to the

---

[1](...continued)
due process clause.

defense, necessarily exonerating the defendant if believed, may violate the due process clause. *See Rock*, 483 U.S. at 61-62; *Crane*, 476 U.S. at 690-91; *Green v. Georgia*, 442 U.S. 95, 97 (1979); *Chambers*, 410 U.S. at 302. *See also Washington v. Texas*, 388 U.S. 14, 22-23 (1967); *Richmond*, 122 F.3d at 874. Due process violations have been found when state courts exclude exculpatory, critical, and exonerating evidence by applying rules of evidence mechanistically, *see Green*, 442 U.S. at 97; *Chambers*, 410 U.S. at 302, or arbitrarily, *see Rock*, 483 U.S. at 61-62; *Crane*, 476 U.S. at 690-91; *Washington*, 388 U.S. at 23. No due process violation occurred here.

The statements and observations in Dr. Garcia's report are not highly exculpatory and would not necessarily exonerate Mr. Ellis if believed. *See Richmond*, 122 F.3d at 874 (noting the evidence must be of the type "that if believed would have, by necessity, exculpated the defendant"). Nor would the report, if admitted, create a reasonable doubt as to Mr. Ellis' sanity that did not exist without it. *See id.* At most, the statements and observations show Mr. Ellis may have had some type of mental disability at the time of the incident. They do not indicate whether Mr. Ellis knew right from wrong. As a result, Dr. Garcia's report was not critical to Mr. Ellis' defense of insanity. Although exclusion of the report may have weakened Mr. Ellis' defense somewhat, it did not prevent him from presenting other evidence, including expert testimony, of his alleged mental disability to

-10-

the jury. That Mr. Ellis chose not to do so does not render an otherwise constitutional exclusion of evidence unconstitutional.

It is also apparent Dr. Garcia's report was not excluded as a result of the state trial court's rigid, mechanistic, or arbitrary application of evidentiary rules. Rather, the trial court determined, after studying the information contained in the report, the report was not relevant to the issue of Mr. Ellis' sanity at the time of the incident. Although Mr. Ellis does have a due process right to present highly exculpatory evidence critical to his defense, the evidence must be relevant; Mr. Ellis has no due process right to present irrelevant evidence. *See, e.g., Rock*, 483 U.S. at 55; *Richmond*, 122 F.3d at 872. Since the trial court's ruling in no way prevented Mr. Ellis from presenting relevant evidence of his sanity, or lack thereof, no due process violation occurred.

Even if the report was relevant, however, I disagree with the majority's conclusion Dr. Garcia's report was "critical" to Mr. Ellis' defense and created a "reasonable doubt" that did not exist without it.[2] The link between Dr. Garcia's report and Mr. Ellis' sanity is simply too tenuous to support a due process violation under *Chambers*.

---

[2] In fact, after seeing Dr. Garcia's report during the sentencing phase, the jurors still sentenced Mr. Ellis to death.

For these reasons, I would affirm the district court's denial of habeas relief on Mr. Ellis' due process claim.