**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**June 21, 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

BENJAMIN HARRIS,

        Petitioner-Appellant,

    v.

DAYTON J. POPPELL, Warden,
Lawton Correctional Facility,

        Respondent-Appellee.

No. 03-6337

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. CIV-02-624-F)**

---

Gloyd L. McCoy, McCoy Law Firm, Oklahoma City, Oklahoma, for Petitioner-Appellant.

John W. Turner, Assistant Attorney General (W.A. Drew Edmondson, Attorney General, Kellye Bates, Assistant Attorney General, with him on the brief), Oklahoma City, Oklahoma, for Respondent-Appellee.

---

Before **HENRY**, **BALDOCK**, and **BRISCOE**, Circuit Judges.

---

**HENRY**, Circuit Judge.

---

Benjamin Charles Harris was convicted of first-degree murder, OKLA. STAT. tit. 21, § 701.7, after a jury trial in the district court of Jackson County, Oklahoma. The court sentenced him to life without the possibility of parole. Mr. Harris argued on direct appeal that the trial court erred in admitting two videotapes that illustrated the testimony of the state's expert witness. The videos supported the state's theory and undermined Mr. Harris's theory of self-defense. The Oklahoma Court of Criminal Appeals ("OCCA") rejected Mr. Harris's challenge to the video reenactments and affirmed his conviction. *See Harris v. State*, 13 P.3d 489, 492-97 (Okla. Crim. App. 2000).

Mr. Harris later filed for a writ of habeas corpus in federal district court under 28 U.S.C. § 2254. He argued in part that admission of the two videos violated his Fourteenth Amendment due process right to a fundamentally fair trial. The magistrate judge recommended that habeas relief be granted as to the due process claim, but the district court rejected that recommendation and denied habeas relief. However, the district court granted a certificate of appealability on the issue. We exercise jurisdiction under 28 U.S.C. § 2253 and affirm the denial of habeas relief for substantially the same reasons set forth in the district court's well-reasoned order.

# I. BACKGROUND

The district court detailed a lengthy and exhaustive review of the events surrounding the murder, the evidence presented at trial, and the content of the videos at issue. *See Harris v. Ward*, No. CIV-02-624-F, 2003 WL 22995021 (W.D. Okla. Nov. 12, 2003); Aplt's App. at 40. Accordingly, we only briefly summarize the facts below.

Mr. Harris shot and killed his friend A.J. Pearce early on the morning of April 22, 1995, as Mr. Pearce sat in the passenger side of a truck in western Oklahoma. Mr. Harris shot Mr. Pearce once in the left side of his torso and three times in the left side of his neck. Mr. Harris had been driving the truck that evening as the two drank alcohol and looked for local parties. According to Mr. Harris, Mr. Pearce attacked him when he told Mr. Pearce not to date his uncle's former wife. Mr. Harris claimed that he shot Mr. Pearce the first time in self-defense after his passenger tried to stab him, and that he fired the second, third, and fourth shots because of acute stress disorder.

A.    Trial court proceedings and description of the videos

Mr. Harris and the government disagreed at trial about Mr. Pearce's position in the truck and the location of Mr. Harris's gun when the shots were fired. According to the state, Mr. Pearce was asleep when Mr. Harris shot him from outside the vehicle. Expert witnesses testified for the state about the

trajectory of the fired bullets and the relative positions of Mr. Harris and Mr. Pearce during the shooting. One of the state's witnesses was Tom Bevel, a forensic consultant who helped county and state investigators to examine and interpret the crime scene evidence. He concluded that, when the shots were fired, Mr. Pearce "would have been sitting in the passenger's seat with it scooted as far back as you could, and then with the backrest reclined in the furtherest [sic] position that it can be." Rec. vol. V, at 924. Mr. Bevel believed that Mr. Pearce was not in an aggressive position when he was struck by any of the four shots because "the bullet strikes would be in a different location than where they are" had Mr. Pearce been in an attacking mode. *Id.* at 916.

Central to our inquiry are two videos introduced during Mr. Bevel's testimony. The videos illustrated the state's theory that Mr. Pearce was asleep when he was shot and also attempted "to disprove a theory that Harris was being attacked or that he was driving while he fired the gun." *Harris*, 13 P.3d at 492. During the first reenactment video, Mr. Bevel explained how video scenes illustrated possible positions, inferred from evidence at the crime scene, of Mr. Harris and Mr. Pearce at the time of the shooting. The first video was produced with two human models; it lasted 3 minutes and 8 seconds and contained no sound. The district court described the scenes as follows:

> *Scene One:* This scene depicts the measurement of the distance from the right side of the passenger seat back to the lower rear area of the

-4-

passenger door.

*Scene Two:*  This scene depicts the measurement of the distance from the gun to the torso.  The driver is not in the driver's seat.  The shooter is shown reaching in from the side of the vehicle to shoot. The viewpoint is from the right side of the vehicle, viewing across the vehicle toward the left side of the vehicle.

*Scene Three:*  This is a close up scene showing the passenger's lower right torso in close proximity to the intersection of the vertical (back) and horizontal (seat) components of the passenger's seat.

*Scene Four:*  This is the same as scene two, viewed from just off the center line, looking rearward.  The shooter is shown to be reaching in from the left side of the vehicle.

*Scene Five:*  This is an illustration of the bullet trajectory, from the gun to the passenger's neck.  The viewpoint is on the centerline, looking rearward.  The shooter is shown to be reaching in from the left window. The gun is positioned approximately on the centerline of the vehicle.

*Scene Six:*  This is a[n] illustration of the position of the gun and the driver, with the driver sitting in the seat, shooting with the gun in his right hand, turning his upper body to shoot.  (Defendant's theory.)  The viewpoint is from the right side.  The bullet entry point is shown to be in mid-torso, on the left side of the passenger, at point blank range.

*Scene Seven:*  This scene is identical to scene six, except that the view is from the right front of the vehicle, looking toward the vehicle centerline.

*Scene Eight:*  This scene is a close up of a point blank gunshot to the left neck of the passenger, viewed from directly in front of the passenger.  The field of view then widens to show the shooter sitting in the left seat, wielding the gun with an outstretched right arm. (Defendant's theory.)

*Scene Nine:*  This scene is a depiction of a measurement from the gun to the middle region of the left side of the passenger's torso. The view is from the right side of the vehicle.  The view then moves down to

show the location of the exit wound in the lower right area of the passenger's torso. The view then moves up and in, to show the passenger's neck.

*Scene Ten:* This is a slow motion depiction of a thrust with a knife. The knife is in the passenger's left hand; the thrust is toward the driver's right thigh. (Defendant's theory.)

*Scene Eleven:* This is substantially identical to scene ten, except that the view is from the right side of the vehicle. The exit wounds in the lower right area of the passenger's torso are also illustrated.

*Scene Twelve:* This scene is an illustration, from the right side of the vehicle, of the driver reaching forward and down for a gun, then turning in the seat to shoot the passenger at point blank range with the gun in his right hand.

*Scene Thirteen:* This is an illustration, also from the right side of the vehicle, of the passenger attacking the driver with the butt end of a knife, as the driver reaches forward and down, as if reaching for a gun under the seat. (This illustrates the State's contention that an attacking passenger could have been expected to have inflicted grievous injuries on the driver as he prepared to defend himself by reaching for the gun under the front area of the driver's seat, as testified to by Mr. Bevel at tr. 922 and argued by the State at tr. 1650.)

Aplt's App. at 51-54 (internal footnotes omitted).

Soon after the first video, the jury watched a computer reenactment narrated by Mr. Bevel. "The second video reenactment is a computer animation based upon the trajectory of the bullet passing through the victim's abdomen and into the vehicle seat." *Harris*, 13 P.3d at 492. The second video lasted 1 minute and 29 seconds and included no sound. The district court described scenes from the second video as follows:

*Scene One:*  This scene shows a generic green sport utility vehicle. This scene transitions to scene two.

*Scene Two:*  This computer-generated animation shows the driver, in the driver's seat shooting the passenger, seated in the passenger seat. The gun is in the driver's right hand.  Nothing is shown to be in the passenger's hands.  The passenger's head is leaning to the right side of the seat.  The passenger's torso is tilted toward the right (passenger) side of the vehicle.

*Scene Three:*   This is a depiction, with a human model in the passenger's position, of the distance from the gun to the passenger, in the scenario illustrated in the second scene.  The shooter's right hand (with gun) is visible.  The shooter is positioned outside of the vehicle (on the driver's side).

*Scene Four:*  This computer-generated animation illustrates the path of a bullet, if fired as shown in scene two.  Nothing is in the passenger's hands. The viewpoint rotates to the passenger's side of the vehicle, to illustrate the proximity of the exit wound for the torso shot (referred to at trial by some witnesses as the side shot) to the lower right passenger-side seat back.

*Scene Five:*  This scene is an illustration of scene four, but with a human model.  Captions for the torso shot entry wound and exit wound are superimposed.  There is a caption ("bullet") in the area where the bullet from the torso shot was found.

*Scene Six:*  This computer-generated scene is substantially identical to scene five.  This scene includes superimposed captions for the entrance wound (left side of the passenger) and the exit wound (right side of the passenger).

*Scene Seven:*  This computer-generated scene depicts the same scenario as scene two, but with a red line illustrating "bullet path" and a blue line indicating "modified bullet path."  (Consistent with defendant's theory, this scene goes on to depict the passenger wielding a knife in his left hand, with a thrust of the knife toward the driver's right thigh.)  The viewpoint is from the passenger's side, forward of the seats.  The viewpoint then shifts to a directly rearward view, with the viewpoint

situated on the centerline between the two seats, with illustration of a "bullet path" (red) from the passenger's upper left to lower right torso (diagonally) and a "modified bullet path" (blue) horizontally across the lower portion of the passenger's torso.

*Scene Eight:* This scene is the same as scene seven except that the passenger is depicted as rising up from his semi-reclined position to thrust the knife toward the driver's right thigh. This scene includes the same rotation of viewpoint as in scene seven. (This scene illustrates the rotation of the passenger's body while he wields the knife, a subject which received much attention from both sides at trial, due to the fact that if, as might reasonably be inferred, a passenger attacking the driver would tend to turn toward the driver, the path of travel of the torso shot through the passenger's torso is somewhat problematic for the defendant.)

*Scene Nine:* This computer-generated scene is the same as scene seven, except that the passenger is wielding the knife in his right hand, with the driver shown to be shooting the passenger with the gun in the driver's right hand. (The bullet path is illustrated in red, from the passenger's upper left to lower right torso.) The passenger's knife-wielding right hand crosses over to thrust at the driver's right leg. The "bullet path" (red) is shown as progressing from the passenger's upper left to lower right torso. The "modified bullet path" (blue) is shown to be progressing from the passenger's left thigh across his groin and to his right side (lower right torso), with an exit location near the exit location shown for the red "bullet path." This scene includes the same rotation of viewpoint (from passenger's side, forward of seats to centerline, between seats) as in scene seven.

Aplt's App. at 54-56 (internal footnotes omitted).

Mr. Harris cross-examined Mr. Bevel about the videos and later called his own expert crime scene reconstructionist, Ronald Singer, to comment and to point out weaknesses with the two videos. In addition, the trial court gave the following limiting instruction, to which Mr. Harris agreed, at the conclusion of Mr. Bevel's direct testimony: "The specific scenes shown in the videos of the

State in which there purports to be specific self-defense moves have not been advanced by the Defendant." Rec. vol. V, at 929.

B.    Direct appeal and petition for federal habeas relief

On direct appeal, the OCCA determined that the two videos were "properly used to illustrate the testimony of the expert witness." *Harris*, 13 P.3d at 497. The OCCA concluded that a video or computer crime scene reenactment must satisfy a three-part test to be admitted as an aid to expert witness testimony. A court should require

> (1) that it be authenticated–the trial court should determine that it is a correct representation of the object portrayed, or that it is a fair and accurate representation of the evidence to which it relates, (2) that it is relevant, and (3) that its probative value is not "substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise."

*Id.* at 495 (quoting OKLA. STAT. tit. 12, §§ 2401-03, 2901). In addition, "the court should give an instruction, contemporaneous with the time the evidence is presented, that the exhibition represents only a re-creation of the proponent's version of the event." *Id.*

The OCCA examined the two videos under each factor. The court concluded that Mr. Bevel's testimony accurately depicted the video scenes and that the crime scene reenactments were both authenticated and relevant. The OCCA also determined that the videos' probative value was not substantially

-9-

outweighed by concerns of prejudice or jury confusion. *Id.* at 496. In fact, the court concluded that "[t]hese tapes cleared up the confusion and made the expert's testimony easier to understand." *Id.*

The OCCA next considered the jury instruction that the district court gave at the end of Mr. Bevel's testimony. The OCCA recognized that this instruction was different from its model instruction, but concluded that the instruction was nonetheless adequate given (1) "vigorous cross-examination of defense counsel," (2) submitted testimony from Mr. Harris's crime scene expert that described potential weaknesses in Mr. Bevel's reenactments, and (3) the trial court's general instruction on expert testimony stating that the testimony should be given weight as the jury determines it is entitled to receive. *Id.* at 497.

The OCCA opinion explicitly addressed the introduction of video or computer scene reenactments only under the Oklahoma evidentiary rules; the OCCA did not reference any federal case law or provide analysis under a federal due process standard. Judge Chapel's dissent, however, carefully pointed out the "overwhelming potential for prejudice" of video reenactments and the "great caution" with which juries must view them. *Id.* at 503.

After the OCCA decision, Mr. Harris filed a habeas petition in federal district court pursuant to 28 U.S.C. § 2254, alleging that the introduction of the two videos denied him a fair trial. The magistrate judge recommended that Mr.

Harris's petition be granted. According to the magistrate judge, de novo review was appropriate because the OCCA did not consider Mr. Harris's federal constitutional claim. When preparing the very thorough recommendation, the magistrate judge did not have the benefit of this court's recent case law concerning state-court adjudication of a federal claim. The magistrate judge further concluded: "Despite the cross-examination of Bevel and the introduction of Singer's testimony, the admission of the videos, coupled with a failure to adequately instruct the jury, denied Petitioner a fundamentally fair trial, and therefore, prejudice of a constitutional magnitude occurred." Aplt's App. at 33 (Magistrate Judge's Report and Recommendation, filed Dec. 31, 2002).

The district court considered the state's objections to the magistrate judge's report and recommendation, and denied Mr. Harris's petition for habeas relief. The district court first decided that the OCCA had adjudicated Mr. Harris's due process claim on the merits and determined that deference accorded under the Anti-Terrorism and Effective Death Penalty Act ("AEDPA") should apply. Under AEDPA deference, the district court determined that the OCCA's decision was not an "unreasonable application" of federal law. Aplt's App. at 75-78.

## II. STANDARD OF REVIEW

We must first consider whether the OCCA adjudicated Mr. Harris's

Fourteenth Amendment due process claim in its state-law evidentiary ruling. Because he filed his § 2254 habeas corpus petition after the effective date of AEDPA, its provisions apply to this appeal. *See Smallwood v. Gibson*, 191 F.3d 1257, 1264 (10th Cir. 1999). If the state court did not decide Mr. Harris's federal claim on the merits, and the claim is not otherwise procedurally barred, we address the claim de novo and AEDPA deference does not apply. If the OCCA adjudicated Mr. Harris's federal claim on the merits, he is entitled to habeas corpus relief if the state court's adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). Mr. Harris does not contend that the OCCA's decision was an "unreasonable determination of the facts" under § 2254(d)(2). We, like the district court, therefore focus our analysis under § 2254(d)(1).

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court set forth the proper application of the AEDPA standard:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies this principle to the facts of the prisoner's case.

> We may not grant habeas relief under the "unreasonable application" clause

-12-

if we conclude independently "that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411; *see also Cook v. McCune*, 323 F.3d 825, 830 (10th Cir. 2003) ("An unreasonable application of federal law denotes some greater degree of deviation from the proper application than a merely incorrect or erroneous application.") (internal quotation marks omitted).

Our case law has perhaps been less than clear about how we determine whether a state court adjudicated a federal constitutional claim on the merits. The Supreme Court's *Early* decision provided:

> A state court decision is "contrary to" our clearly established precedents if it applies a rule that contradicts the governing law set forth in our cases or if it confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent. *Avoiding these pitfalls does not require citation of our cases–indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.*

*Early v. Packer*, 537 U.S. 3, 8 (2002) (emphasis added) (internal citation and quotation marks omitted).

In *Cook*, we interpreted *Early* broadly to apply "the AEDPA standard to a claim which the State court disposed of without citing controlling Supreme Court precedent." 323 F.3d at 831. Although the Kansas Supreme Court cited no federal precedent, we concluded that AEDPA deference under the "unreasonable application" clause of § 2254(d)(1) should apply. *Id.* at 830-31. Where "there is

-13-

no indication suggesting that the state court did *not* reach the merits of a claim, we have held that a state court reaches a decision 'on the merits' even when it fails either to mention the federal basis for the claim or cite any state or federal law in support of its conclusion." *Gipson v. Jordan*, 376 F.3d 1193, 1196 (10th Cir. 2004) (citing *Aycox v. Lytle*, 196 F.3d 1174, 1177 (10th Cir. 1999)); *see also Wansing v. Hargett*, 341 F.3d 1207, 1211-12 (10th Cir. 2003) (concluding that we may find "an implicit judgment on the federal issue" in the state-court decision). *But cf. Ellis v. Mullin*, 326 F.3d 1122 (10th Cir. 2002) (reviewing a federal due process claim de novo because the OCCA upheld the exclusion of a pre-trial report under state law without any reference to appellant's federal constitutional claim).

To determine the appropriate standard of review under AEDPA, we have also examined whether the state court's standard is at least as favorable to the petitioner as the federal standard. In *Romano v. Gibson*, this court applied AEDPA deference to a state-court decision after determining that the state-law standard for sufficiency of the evidence was "more onerous" than the federal standard. 239 F.3d 1156, 1164 (10th Cir. 2001). "[I]f the evidence was sufficient to meet [the state's] stricter test, it would certainly also meet the [federal] standard." *Id.*; *see also Upchurch v. Bruce*, 333 F.3d 1158, 1164 n.4 (10th Cir. 2003) (concluding that a state court adjudicated a federal claim on the merits

because the state standard for a claim of ineffective assistance of counsel "mirrors" the federal standard). Thus, if the OCCA rejected Mr. Harris's claim under a standard that is equally or more favorable to him relative to the federal standard, the state court's decision constitutes an adjudication of the federal claim despite citing no federal decisions. Obviously, in such a case, "neither the reasoning nor the result" of the state-court decision would contradict federal law. *Early*, 537 U.S. at 9.

Here, the OCCA undertook a detailed analysis under state law and concluded that the videos in question met the state court's newly devised, multi-factor test for trial introduction. *Harris*, 13 P.3d at 495. When the OCCA rejected Mr. Harris's state evidentiary claim under his first proposition, it also implicitly rejected any federal due process challenge. We agree with the district court that the OCCA's "extended treatment" of the videos' admission is an adjudication on the merits under 28 U.S.C. § 2254(d), despite no citation to Supreme Court precedent.[1] Aplt's App. at 70. We also agree with the district court that the OCCA standard for trial reenactments is at least as favorable to Mr.

---

[1]We do have some concern that Mr. Harris adequately raised and briefed his federal constitutional claim before the OCCA. The state, however, does not argue that the federal claim is procedurally barred. *See* Aplt's App. at 66 n.17 ("[T]he [district] court is confident that any procedural default would have been pointed out by respondent in its response to the petition [to the district court]. Accordingly, the court sees no need to inquire further into the possibility of a procedural default.").

Harris as the federal standard for a due process violation. The district court "easily" concluded that the OCCA's multi-factor test and limiting instruction "take[] into account the bedrock principles which would inform any application of the *Chambers* fundamental fairness standard." *Id.* at 74.

Therefore, the OCCA decision is an adjudication on the merits of Mr. Harris's federal constitutional claim, and we apply AEDPA deference.

## III. ANALYSIS

Both parties agree that *Chambers v. Mississippi*, 410 U.S. 284 (1973) provides the applicable Supreme Court precedent and federal due process standard. In *Chambers*, the petitioner alleged a due process violation caused by a state court's application of a state evidentiary rule; the rule prevented him from cross-examining a witness or presenting witnesses on his own behalf who would have discredited a damaging witness. *Id.* at 292-94. The Supreme Court concluded that the exclusion of critical evidence, coupled with an inability to cross-examine the harmful witness, "denied [the petitioner] a trial in accord with traditional and fundamental standards of due process." *Id.* at 302; *see also Payne v. Tennessee*, 501 U.S. 808, 825 (1991) ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.").

Our court has concluded that

> [w]e may not provide habeas corpus relief on the basis of state court evidentiary rulings unless they rendered the trial so fundamentally unfair that a denial of constitutional rights results. Because a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint.

*Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks and citations omitted). Our "inquiry into fundamental unfairness requires examination of the entire proceedings, including the strength of the evidence against the petitioner . . . [and] [a]ny cautionary steps–such as instructions to the jury–offered by the court to counteract improper remarks." *Le v. Mullin*, 311 F.3d 1002, 1013 (10th Cir. 2002). "Ultimately, this court considers the jury's ability to judge the evidence fairly in light of the prosecutor's conduct." *Id.*

In considering Mr. Harris's *Chambers* claim with the appropriate AEDPA deference, the district court determined that the "contrary to" clause did not apply because "no Supreme Court decision, expounding constitutional law, . . . would cast doubt upon the constitutional soundness of the test adopted by the OCCA." Aplt's App. at 76. Instead, the district court concluded that this case better fit the context of the "unreasonable application" clause. It went on to state that (1) the OCCA's legal standard for admitting the videos was not an "unreasonable application" of *Chambers* and (2) the OCCA standard was not applied in a "constitutionally untenable way." *Id.* at 76-78. The district court found relevant

-17-

Mr. Harris's opportunity to contest the videos, and considered the challenges "inherent in the videos" to be "nothing more than the challenges inherent in trying a hotly contested case." *Id.* at 78.

We acknowledge the concerns of the magistrate judge and the OCCA's dissent that the videos went beyond their use as demonstrative aids to illustrate Mr. Bevel's testimony. When a video represents one party's staged recreation of facts in controversy, "not only is the danger that the jury may confuse art with reality particularly great, but the impressions generated by the evidence may prove particularly difficult to limit." *Robinson v. Missouri Pacific R.R. Co.*, 16 F.3d 1083, 1088 (10th Cir. 1994) (quoting 2 MCCORMICK ON EVIDENCE, § 19 (4th ed. 1992)); *see also Sanchez v. Denver and Rio Grande W. R.R. Co.*, 538 F.2d 304, 306 n.1 (10th Cir. 1976) (instructing trial courts to "scrutinize the foundation with great care as to detail" when admitting motion pictures that "purport to represent a reenactment of human conduct."). We also do not lightly dismiss the magistrate judge's concern that the videos affected the jury's verdict because (1) there were no eyewitnesses, (2) the crime scene was not preserved, and (3) "the crux of the issue before the jury was whether Petitioner acted in self-defense." Aplt's App. at 35-36.

Nonetheless, the OCCA decision was not an unreasonable application of *Chambers*. Though the jury was not given the "model" instruction that the OCCA

-18-

prefers and the videos likely made Mr. Harris's theory of self-defense less plausible, we cannot conclude that the alleged error in the OCCA's evidentiary ruling "was so grossly prejudicial that it fatally infected the trial and denied the fundamental fairness that is the essence of due process." *Bullock v. Carver*, 297 F.3d 1036, 1055 (10th Cir. 2002) (quoting *Revilla v. Gibson*, 283 F.3d 1023, 1212 (10th Cir. 2002)). We agree with the district court's analysis that the two videos were relevant and had evidentiary support for their introduction. Mr. Harris had adequate trial opportunity to challenge the evidentiary underpinnings and possible inferences drawn from the videos. *Cf. id.* (rejecting federal due process challenge to reliability of children's testimony when improper interviewing techniques with children "were fully identified, examined, criticized, and interpreted at a trial in which [petitioner] was represented by competent counsel"). Finally, unlike the state-court ruling in *Chambers* that actually prevented a defendant from presenting a specific defense, Mr. Harris was not absolutely *barred* from asserting self-defense with regard to the murder; indeed, he presented evidence and called his own expert witness in support of his theory.

## IV. CONCLUSION

For substantially the same reasons set forth in the district court's order, we AFFIRM its denial of Mr. Harris's petition for habeas relief.

-19-